**JACOBS, P.C.**
*Proposed Attorneys for the Debtors*
*New Tent, LLC and*
*Neo Image Enterprises, LLC*
**595 Madison Avenue - 39th Floor**
**New York, New York 10022**
**212-229-0476**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------------x

In re:                                                                                    Chapter 11

      NEW TENT, LLC, and
      NEO IMAGE ENTERPRISES, LLC                               Case No. 24-10015-JPM
                   Debtors.          (Jointly Administered)


-----------------------------------------------------------------------------x

      NEW TENT, LLC, NEO IMAGE
      ENTERPRISES, LLC, CHEN
      FOUNDATION, INC., TLT & J
      ENTERPRISES, LLC, NEW WORLD ART
      CENTER, INC., TSING FANG CHEN,
      LUCIA CHEN, TED CHEN and JULIE CHEN

                         Plaintiffs,          Adv Proc. No.:
    -against-

      SHANGHAI COMMERCIAL BANK LTD.,
      NEW YORK BRANCH, THE SHANGHAI
      COMMERCIAL AND SAVINGS BANK, LTD.,
      TIMOTHY CHAN, JOSEPH LAU, CN WU,
      FENG TIAN, PARTNER ENGINEERING
      AND SCIENCE, INC., PARTNER ASSESSMENT
      CORPORATION, ROBERT RAFANELLI,
      SUZANNE McCLENNON, JULIE REQUARTH,
      SCG AMERICA CONSTRUCTION, INC., and
      SCG AMERICA GROUP, INC.

                         Defendants.

-----------------------------------------------------------------------------x

## COMPLAINT

New Tent, LLC ("*New Tent*") and Neo Image Enterprises, LLC ("*Neo Image*", and together

with New Tent, collectively the "***Debtors***" or the "***Owner Plaintiffs***"), together with the Chen Foundation, Inc.[1] (the "***Chen Foundation***"), TLT&J Enterprises, LLC ("***TLTJ***"), New World Art Center, Inc., ("***New World***"), Tsing Fang Chen ("***TF Chen***"), Lucia Chen ("***Lucia***"), Ted Chen ("***Ted***") and Julie Chen ("***Julie***", and together with TF Chen, Lucia, and Ted, the "***Chen Family***", and together with TLTJ and New World, collectively, the "***Guarantor Owner Plaintiffs***", and together with the Owner Plaintiffs and the Chen Foundation, collectively, "***Plaintiffs***") hereby complain and allege as follows:

## INTRODUCTION

1.      In 2016 the Owner Plaintiffs acquired a 12-story building located at 335 West 35th Street, Manhattan, NY, (the "***Property***") containing approximately 72,592 square feet, originally constructed almost 100 years earlier, which was then being used for offices and as lofts for light manufacturing (the "***Building***").

2.      The Owner Plaintiffs intended to redevelop the Building into a mixed-use project containing 66 luxury residential condominiums, a roof garden, an art gallery in an 11,000 sq. ft. retail space on the first and second floors of the Building (the "***Project***").

3.      The Owner Plaintiffs retained Issac & Stern Architects, P.C., who had previously been involved in the design of a redevelopment plan for that property, as the Project Architect for the redevelopment of the Building, by taking the existing building to its structural shell, and effectively building a new, luxurious building within that shell, with all new infrastructure, elevators, windows, electric, plumbing, heating, air conditioning, appliances and finishes.

---

[1] The Chen Foundation is also a debtor in possession in a Chapter 11 Case, Case No: 24-10438-JPM in the Bankruptcy Court for the Southern District of New York, which was filed on March 18, 2024.

2

4.    Plaintiff New Tent, LLC is owned by TLTJ.    Plaintiff Neo Image Enterprises LLC is owned by New World. TLTJ's and New World's equity holders comprise the family members of the Chen Family (the "***Principals***"), who were primarily involved in promoting the artwork of their famous relative, Plaintiff TF Chen, through the Chen Foundation, and who operated an art gallery as well as a not-for-profit cultural center.

5.    Although certain members of the Chen Family had some experience owning and operating real estate, none of them had ever been involved with a re-development Project as large and complex as the Building, which was the gut renovation of a high-rise, mixed-use, urban re-development, expected to cost $80+/- Million to complete, and which involved the complexities of building a "new" building within an existing shell.

6.    To finance the Project, the Owner Plaintiffs turned to then Chairman of the bank that the Chen Family had trusted and had been doing business with for generations - the Shanghai Commercial and Savings Bank, Ltd. ("***SCSB***"), which is located in Taiwan (the "***Taiwan Branch***"), where the Chen Family has its roots.

7.    The then Chairman of SCSB introduced the Chen Family to the senior management of SCSB's New York branch– the Shanghai Commercial Bank, Ltd. ("***SCB***").

8.    On or about June 23, 2017, pursuant to a Loan Syndication Agreement, SCB and SCSB agreed to make a series of loans to the Owner Plaintiffs to refinance the then existing $50 Million in loans which the Owner Plaintiffs obtained to acquire the  Property, and an additional Eighteen Million Dollars ($18,000,000.00) in Project and Building Loans to finance the construction and re-development of the Building, of which SCB committed to provide sixty percent (60%) of the funding, and SCSB committed to provide forty percent (40%) of the funding (the "***Project Loans***"),

3

9.      In addition to a first mortgage secured by the Property (the "*35th Street Mortgage*"), SCB and SCSB (collectively the "*Banks*" or "*Defendant Banks*"), demanded, as additional collateral for the Project Loans, and obtained, a first mortgage on a property unrelated to the Project located at 250 Lafayette Street, New York, NY (the "*Lafayette Street Property*"), and which was not owned by the Owner Plaintiffs, but owned by the Chen Foundation (the "*Mortgage*").

10.     Prior to having acquired the Property, the Lafayette Street Property was owned "free and clear" by the Chen Foundation.

11.     The Chen Family resides in a residential unit in the Lafayette Street Property and operates an art gallery in that building.

12.     In addition to the 35th Street Mortgage and the Lafayette Mortgage, the Banks demanded, as additional collateral for the Project Loans, and obtained, what the Banks purports are guarantees from the Chen Foundation, TLTJ and New World (the purported "*Corporate Guarantors*") and TF Chen, Lucia, Ted and Julie (the purported "*Individual Guarantors*", and together with the purported Corporate Guarantors, collectively, the "*Purported Guarantors*").

13.     Although the Chen Family had not previously dealt with the New York branch of the Banks, because the Chen Family had a long-term beneficial relationship with SCSB, and personally knew the then Chairman of the Board of SCSB (who made the introduction to the New York branch), and trusted him; and because they felt that SCSB had always dealt with them in a reasonable, fair and trustworthy manner, they were not concerned when the Banks required that they provide additional collateral, believing that the Banks would continue to deal with them in the same appropriate and honest way as the Taiwan Branch had

done for many years.

14.     But they were wrong.

15.     Almost from the start of their relationship with SCB's New York branch, the Owner Plaintiffs experienced anything but a "good" relationship with the Banks, and its New York staff.

16.     Unlike the relationship of trust and confidence that Owner Plaintiffs enjoyed with the Taiwan Branch, Owner Plaintiffs' experience with the New York branch can best be described as a series of ever-worsening nightmares, eventually resulting in the loss of the Chen Family fortune, causing the Owner Plaintiffs and the Chen Foundation to seek Bankruptcy protection, and putting the Chen Family at risk of losing their shared residence in the Lafayette Street Property, and the only remaining business they operate, the art gallery which is also located at the Lafayette Street Property.

17.     Instead of acting as a responsible lender, the New York branch of the Banks and several of its senior management, including, Defendants Timothy Chan ("*Chan*"), Joseph Lau ("*Lau*"), CN Wu ("*Wu*") and/or Feng Tian ("*Tian*"), either intentionally, recklessly, or negligently took wrongful predatory actions against Plaintiffs, as fully detailed in this Complaint.

18.     Plaintiffs bring this Adversary Proceeding against the Banks for breach of contract, and together with the individual Bank employees, Wu, Chan, Lau and Tian, for fraud, economic duress, dissipation of collateral, breach of the implied duty of good faith and fair dealing, unfair business practices, intentional interference with contractual rights, failure to fund, common law indemnification, negligence and/or recklessness, as well as claims under common law theories of instrumentality, all as more detailed herein.

19.     Plaintiffs also bring a breach of fiduciary duty claim against the Banks, and against the individuals Chan, Lau, Wu, and Tian, as aiders and abettors to the Banks' breaches of fiduciary duties, because (i) the borrower Owner Plaintiffs reposed faith, confidence, and trust in the Banks and the Banks' employees, (ii) the borrower Owner Plaintiffs were and are in a position of inequality, dependence, weakness or lack of knowledge, and (iii) the Banks have wrongfully exercised dominion, control, or influence over Owner Plaintiffs and their businesses as detailed herein.

20.     Plaintiffs also bring this Adversary Proceeding against Partners Engineering and Science, Inc. and its affiliate, defendant Partner Assessment Corporation, and Robert Rafanelli, Suzanne McClennon and Julie Requarth for negligence, professional malpractice, intentional interference with contractual rights, and common law indemnification.

21.     Plaintiffs also bring this Adversary Proceeding against defendant SCG America Construction Inc. and SCG America Group Inc., for intentional interference with contractual rights and for unfair business practices.

22.     Because the Banks used coercion, threats and unlawful intimidation to secure, a wholly unconscionable one-sided Forbearance Agreement, requiring the Owner Plaintiffs to provide the Banks with a deed in lieu of foreclosure, such Forbearance Agreement is voidable, and Owner Plaintiffs bring a declaratory judgment claim against the Banks, asking this Court to declare the coerced Forbearance Agreement and deed in lieu void *ab initio*.

23.     Owner Plaintiffs also bring this Adversary Proceeding against the Bank's individual employees, defendants Chan, Lau, Wu, and/or Tian, for fraud, intentional interference with contractual rights, and common law indemnification.

## **PARTIES, JURISDICTION AND VENUE**

24.     The Owner Plaintiffs filed their voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Case") on January 5, 2024 (the "Petition Date").

25.     Plaintiff Chen Foundation is also a Debtor in Possession, having filed a petition for relief under chapter 11 of the Bankruptcy Code (the "Chen Foundation Case") in this Court on March 18, 2024, and assigned case no. 24-10438-JPM.

26.     The Owner Plaintiffs and the Chen Foundation continue possessing their properties and operating their businesses as debtors in possession, pursuant to 11 U.S.C. §§ 1107 and 1108.

27.     The Owner Plaintiffs' business is owning and re-developing the Project, consisting of a mixed-use 12-story and penthouse elevator serviced building located at 335 West 35th Street, Manhattan, New York, containing 72,591.56 gross square feet. The Building is undergoing renovations to convert the existing improvements into 66 residential apartments and 11,000 sq. ft. of retail space on the first and second floors.

28.     The Chen Foundation owns the Lafayette Street Property and operates an art gallery within that property.

29.     No committee of unsecured creditors has been appointed in this Case or the Chen Foundation Case.

30.     No trustee was appointed in this Case or the Chen Foundation Case.

31.     This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §§ 1334 and 157.

32.     Upon information and belief, this matter is a "core proceeding" as that term is defined by 28 U.S.C. § 157.

33.     Upon information and belief, this matter is a "related to proceeding" as that term is defined by 28 U.S.C. § 157.

34.     Upon information and belief, this action concerns a "public right."

35.     Plaintiffs consent to this Court entering a final judgment in this action.

36.     This district is the appropriate district to consider this action, pursuant to 28 U.S.C. § 1409.

37.     Upon information and belief, defendant SCB is a US Bank, with its principal office located at 125 East 56th Street, New York, New York 10022, and acts as the New York Branch, and Administrative Agent, for defendant SCSB.

38.     Upon information and belief, defendant, SCSB is a Taiwanese Bank, with its principal office located at 85 Chung Ping Road, Hsinchuang, New Taipei City, Taiwan, Republic of China, with its Administrative Agent maintaining an office at 125 East 56th Street, New York, New York 10022.

39.     Upon information and belief, defendant Chan is an individual employee of defendant SCB with an office located at 125 East 56th Street, New York, New York 10022.

40.     Upon information and belief, defendant Lau is an individual employee of defendant SCB with an office located at 125 East 56th Street, New York, New York 10022.

41.     Upon information and belief, defendant Wu is an individual employee of defendant SCB with an office located at 125 East 56th Street, New York, New York 10022.

42.     Upon information and belief, defendant Tian is an individual employee of defendant SCB with an office located at 125 East 56th Street, New York, New York 10022.

43.     Upon information and belief, defendant Partners Engineering and Science, Inc. ("*Partners Engineering*") is a global engineering firm, and a corporation with an office

located at 362 5th Ave #501, New York, NY 10001.

44.    Upon information and belief, defendant Partners Assessment Corporation ("***Partners Assessment***") is an affiliate of defendant Partners Engineering and has a office located at 362 5th Ave #501, New York, NY 10001.

45.    Upon information and belief, defendant Robert Rafanelli ("***Rafanelli***") is an individual engineer, architect and/or project manager, and an employee of defendant Partners Engineering and/or defendant Partners Assessment with an office located at 362 5th Ave #501, New York, NY 10001.

46.    Upon information and belief, defendant Suzanne McClennon ("***McClennon***") is an individual engineer, architect and/or project manager, and an employee of defendant Partners Engineering and/or defendant Partners Assessment with an office located at 362 5th Ave #501, New York, NY 10001.

47.    Upon information and belief, defendant Julie Requarth ("***Requarth***") is an individual engineer, architect and/or project manager, and an employee of defendant Partners Engineering and/or defendant Partners Assessment with an office located at 362 5th Ave #501, New York, NY 10001.

48.    Upon information and belief, defendant SCG America Construction Inc. ("***SCG America Construction***") is a corporation with an office located at 1500 Broadway, Suite 3300, New York, NY 10036.

49.    Upon information and belief, defendant SCG America Group Inc. ("***SCG America Group***" and together with the Banks, Chan, Lau, Wu, Tian, Partners Engineering, Partners Assessment, Rafanelli, McClennon, Requarth, and SCG America Construction, hereinafter the "***Defendants***") is a corporation with an office located at 1500 Broadway, Suite

3300, New York, NY 10036.

## **BACKGROUND**

## **OWNER PLAINTIFFS SEEK TO HIRE A NEW CONTRACTOR**

50.     Initially, the Owner Plaintiffs retained Sweeney Lee (a/k/a Jonathan Lee), and his companies, Gon Way Construction and Star Builders, Inc., as the general contractor for the Project.

51.     However, by early 2019, it became evident that Sweeney Lee and his companies were not timely, nor properly, executing the work, and Owner Plaintiffs also feared that there were financial improprieties going on.

52.     Owner Plaintiffs terminated Sweeney Lee's and his companies' construction contract as general contractor for the Project in November 2019.

53.     In anticipation of retaining a new, competent general contractor to complete the Project, Owner Plaintiffs reached out to their Builder's Risk insurance broker, Yung Ooi, of Oakmont Insurance Services, Inc., who represented many contractors and developers, for a recommendation of a highly competent contractor who could complete the Project.

54.     Yung Ooi recommended David Lo, and his company Mandarin Enterprises II, Inc., who had a good reputation and a good track record.

55.     Owner Plaintiffs met with Mr. Lo, investigated his experience and ability to timely deliver Projects of similar size and scope as the Project, sought references from third parties who had contracted with Mr. Lo, and were favorably impressed.

56.     The Owner Plaintiffs decided to retain Mr. Lo and his company as the successor general contractor to finish the Project, which was then being financed by the Banks.

57.     The Banks' loan documents required that any change of the general

contractor would require the Bank's prior approval.

58.     In early 2020, Owner Plaintiffs met with the Bank's representative, defendant Wu, to advise of their desire to retain Mr. Lo and his company as the general contractor to complete the Project and sought the Bank's approval.

59.     Owner Plaintiffs shared the positive references they received from Mr. Lo's prior developer customers, his good reputation in the community, and his track record of successfully completing Projects in New York and asked the Banks to consent to their retaining Mr. Lo's company as the successor general contractor.

60.     The Banks refused to consent.

61.     Defendant Wu informed Owner Plaintiffs that the Banks were "not familiar" with Mr. Lo or his company, and could not consent to Owner Plaintiffs retaining him, as the Banks had no certainty that he had the ability to complete the Project.

62.     Instead, defendant Wu, on behalf of the Banks, introduced Owner Plaintiffs to Frank Ng, who he represented to be a highly qualified and experienced general contractor, with an extensive track record, having successfully built sizeable Projects in New York, as well as being a "very good" customer of the Banks.

63.     Defendant Wu informed Owner Plaintiffs that the Banks would be comfortable approving Frank Ng as the new contractor for the Project.

64.     Although defendant Wu stated that his "recommending" Frank Ng was not the Banks recommendation, and that the Owner Plaintiffs need to decide who should be hired as the next general contractor, his words belied his actions, and Owner Plaintiffs believed that no matter who Owner Plaintiffs may have selected, defendant Wu, on behalf of the Banks would find a reason to deny approval.

11

65.     Defendant Wu also made clear that Owner Plaintiffs must be "careful" not to mention Frank Ng's name to any of the other Banks employees with whom Owner Plaintiffs communicated, and not to include Frank Ng's name on any email or other correspondence, as the other employees would get "sensitive" as Frank Ng was an "important customer" from the Bank's foreign headquarters.

66.     By this time Owner Plaintiffs and the Principals[2] had borrowed approximately $68 million to finance the Project from the Banks through a combination of acquisition, construction, and Project loans, in addition to the at least $20 million of capital contributed by the equity holders (or Plaintiffs).

67.     Owner Plaintiffs felt that they had no choice but do what the Banks wanted. Owner Plaintiffs could not let any more time pass, and relying on defendant Wu's glowing representations, agreed to retain Frank Ng as the successor general contractor to complete the Project.

68.     The Owner Plaintiffs began negotiating a new construction contract for completion of the Project with Frank Ng and his "Project Manager" Kyle Ng.

69.     Having been disappointed by their prior experience with Sweeney Lee, and their concerns over the increasing costs of the Project, they insisted that the construction contract with Frank Ng be on a Guaranteed Maximum Price ("**_GMP_**") basis.

70.     A GMP contract provides for a fixed price, or a maximum price, for which a contractor would provide a defined Scope of Work on a Project for the owner, and if the costs of the Project exceed the GMP, it is the contractor's responsibility to pay for all such "over-runs".

71.     In Order to determine a GMP, a contractor must usually undertake a careful

---

[2] As well as the Chen Foundation, an affiliate of the Principals.

review of the plans and specifications for which the building permits were approved, inspect the site, the state of, and condition of, existing site conditions and construction, in order to determine the scope of work necessary to resolve any construction issues and complete the Project in accordance with the approved plans and specifications, and then price that scope of work.

72.    In some GMP construction contracts the contractor and the owner "share" any actual cost savings off-of the GMP.  If there is no cost-sharing arrangement in the contract, then the contractor is the only one who benefits from any cost savings and is therefore incented to move the Project forward quickly and expeditiously.

73.    However every GMP construction contract allocates risk of cost over-runs onto the contractor, who is solely at risk for, and responsible to pay, any and all cost over-runs if the scope of the work is not changed. [3]

74.    Owner Plaintiffs advised the Banks and Frank Ng that the only way they would be prepared to retain Frank Ng as their contractor would be on a "GMP" basis, with the contractor being at risk for any costs in excess of an agreed GMP, without an owner cost-sharing provision, so that the contractor is incented to perform the Work quickly and expeditiously.

75.    After considerable negotiations, site inspections, and plan reviews, by early March 2020, Frank Ng agreed to complete the Project pursuant to a GMP of $11,236,000.00, inclusive of all the work necessary to resolve any construction problems and complete the Project in conformance with the plans and specifications.

76.    Owner Plaintiffs and the Banks agreed to the GMP, and asked Frank Ng to prepare a GMP contract on an AIA GMP form for the parties' signatures.

_____

[3] For example, where an owner, during the construction process, instructs the architects to make "changes" to the plans and specifications not anticipated or reasonably inferable from the priced plans and specifications, and the artect issues a Change Bulletin and a new set of plans and specification (such as adding a floor to a building, or changing an existing straight wall to a curved wall, or changing the cooking appliance requirements from electric to gas, or the change of materials (from a less expensive to a more expensive one - such as marble for wood).

77.     Owner Plaintiffs expected that after agreeing to retain Frank Ng, the Bank's hand-selected general contractor, and finalizing the GMP things would begin to go forward much more smoothly.

78.     As soon as the terms of the GMP contract were finalized, but before it was presented for signature, Owner Plaintiffs were told by Kyle Ng that they were required to retain another company that they had never heard of, nor ever dealt with – Milestone Construction Corp. ("***Milestone***") to "oversee" Frank Ng's work, and that Owner Plaintiffs had to pay  Two Hundred Thousand Dollars ($200,000.00) to Milestone,[4,] a company they had never previously heard of, who would be fronting for Frank Ng as the general contractor "handling" and "watching over" the Project for Frank Ng., and that the $200,000.00 was the "fee" paid to Milestone for Frank Ng to use Milestones' licenses and insurance which are required for a licensed contractor to operate in New York.  He referred to Milestone as the "Paper GC".

79.     Owner Plaintiffs did not understand why they were then being told that Milestone "must" be paid Two Hundred Thousand Dollars to front for Frank Ng, when the Banks through defendant Wu, represented Frank Ng was a qualified general contractor capable of successfully building complex projects in New York.

80.     Another company did not need to be involved, given the Bank's glowing description of Frank Ng's abilities, experience, and success in completing complex construction in high-rise buildings in New York.

81.     In pursuing a better explanation of why Owner Plaintiffs were being instructed to retain Milestone to "handle" the construction Project and "oversee" Frank Ng, Owner Plaintiffs were advised that it was because Frank Ng was a wealthy customer of the Banks, and

---

[4] Against the GMP under the Contract.

therefore it would be a "conflict of interest" if Frank Ng were on the building permit as the general contractor for a project which was being funded by the Banks, but that he was really going to be the contractor on the Project, and that Milestone, who had the licenses, insurances, and site safety license and staff, was only "fronting" for Frank Ng to "avoid a conflict of interest".

82.     Defendant Wu also instructed Owner Plaintiffs not to "ever speak of Frank Ng's involvement", that his name should not show up on any of the papers or contracts relating to the Project, and that Owner Plaintiffs and the Principals should not write to, nor include Frank Ng's name on any email or other correspondence, and that the Banks would look unkindly at Owner Plaintiffs were they to tell "anyone" of Frank Ng's involvement in the Project.

83.     Defendant Wu's admonitions led Owner Plaintiffs to become concerned that the Bank's New York employees, were using Owner Plaintiffs, not only to benefit the Bank's preferred customers, but also to enrich the Bank's New York employees, who Owner Plaintiffs believe, may have received bribes and/or kickbacks from the contractors, and other persons employed at the Bank's insistence for the Project, and should Plaintiffs identify evidence in support thereof during discovery, Plaintiffs reserve the right to amend this Complaint with respect to same.

84.     Owner Plaintiffs felt betrayed by the Banks and became increasingly concerned that the Banks and defendants Wu, Chan. Lau and Tian were using them and the Project's available, and as yet un-funded, loan availability, not to benefit Owner Plaintiffs or the Project, but to enrich the Bank's preferred customers at Owner Plaintiffs' expense, and this raised concerns about whether the Bank employees, defendants Wu, Chan, Lau and Tian, were also

15

somehow wrongfully profiting at Plaintiffs' expense.[5]

85.    Even though the Owner Plaintiffs had no say in the decision to retain Milestone as the general contractor for the Project, and though they felt "trapped", given the mounting interest costs, their fear of further delays in completing the Project, and the risk of losing more time finding another contractor, who would likely not be approved by the Banks -- Owner Plaintiffs relented, and agreed to retain Milestone as successor general contractor for the Project.

86.    Milestone was tasked with preparing a GMP contract for the Project.

87.    On March 6, 2020, Mike S. Lee, the "front man" for Frank Ng, and the Project Manager for Milestone sent an email to Owner Plaintiffs' representative, Janet Chong, confirming that the contract was to be a GMP contract and acknowledging that the Banks had requested a GMP contract, stating:

> "Janet:
>
> Please review, advise, and approve attached 335 W 35th St Milestone construction proposal.
>
> AIA GC GMP, **GMP,**
> **Agreement to follow _as requested by Banks_**.
>
> Thanks.
> Mike Lee

(Emphasis added)

88.    On March 6, 2020, Mike Lee, on behalf of Milestone, sent Owner Plaintiffs a GMP budget of $11,236,000.00 for completion of the Project (the "**GMP Budget**"). A copy of that GMP Budget is attached hereto as Exhibit "A".

---

[5] Plaintiffs believe that Defendants Wu, Chan, Lau and Tian were involved in wrongful self-dealing and may have received bribes and kickbacks from Frank Ng, Milestone, Mike Lee, and/others others in connection with the 35th Street Project, but currently have no documentary evidence to establish same. Plaintiffs expect that during discovery they may identify evidence to support same, and hereby reserve the right to amend this complaint to include additional claims for such wrongful acts, including, without limitation, claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968, should the evidence warrant same.

89.     Upon reviewing the March 6, 2020 Milestone GMP Budget, Owner Plaintiffs discovered that several items in the Budget were marked as "allowances" [6] which was not Plaintiff's understanding of the deal.

90.     On March 9, 2020. Janet Chong, on behalf of Owner Plaintiffs, wrote an email to Mr. Lee about this discrepancy, stating:

> "Hi Mike,
>
> Thanks for the info.
> SCB headquarter already approved Milestone Construction Corp as our 35st GC but when we reviewed the budget provided, there are "allowances" everywhere. We need that to be removed and your company to commit to a real GMP at $11mill before I can send the budget to SCB. They would have serious concern we will be over-budget when the allowance is over. Pls kindly make amendment and resend it to me today.
>
> Best,
> Janet"

91.     On March 9, 2020, Mike Lee, on behalf of Milestone, replied to Janet Chong by email, agreeing with her, and confirming that the "allowance" items are not really allowances, confirming: "[i]t's set as allowance for budget only", and confirming that the Banks does "not want to see so many allowance items".

92.     At the insistence of the Banks, on or about March 11, 2020, Owner Plaintiffs as "Owner", and Milestone as "Contractor" entered into a GMP construction contract to complete construction of the Project (the ***"Contract"*** or ***"GMP Contract"***) [7], pursuant to which, for a GMP of  Eleven Million Two Hundred Thirty-Six Thousand Dollars ($11,236,000.00),

---

[6] In construction contracts, "allowances" are an amount for the cost of items for which a party cannot determine with certainty when a bid or proposal is submitted. This could occur where a Project's finish or level of quality have not been finally determined, or because of variations expected to occur after bidding. Allowances are used in cost or budget estimates until a more accurate number can be obtained.

[7] All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms under the Contract.

17

Milestone agreed to perform all the "Work" necessary to complete the Project, and deliver a temporary certificate of occupancy within fifty-four (54) weeks of obtaining the building permit for the Project. A copy of the GMP Contract is attached hereto as Exhibit "B".

93.    Based on the construction Schedule attached and incorporated into the GMP Contract, Milestone was contractually obligated to achieve Substantial Completion and deliver a Temporary Certificate of Occupancy for the Project by May 3, 2021.

94.    Milestone failed to achieve Substantial Completion within the 54 weeks required under the GMP Contract.

95.    At the insistence of the Banks, and notwithstanding that Owner Plaintiffs received no consideration for same, the Substantial Completion date was extended to January 19, 2022 (the "Extended Substantial Completion Date").

96.    Milestone failed to achieve Substantial Completion by the Extended Substantial Completion Date and has been in breach of the GMP Contract from at least that date forward.

97.    Throughout the term of Milestone's involvement with the Project, Milestone wrongfully demanded Change Orders for Work that was contractually included in the Scope of Work and within the GMP of $11,236,000.00.

98.    Notwithstanding that the parties executed a GMP Contract, and notwithstanding that the GMP Contract expressly excluded any allowances, in express violation of the GMP Contract issued One Hundred Sixty Five (165) Change Orders for the Project totaling many millions of dollars for Work which was expressly included in both the Scope of Work, and the GMP (the "*Fraudulent Change Orders*").

99.    The Banks, as well as defendants Partners Engineering and Partners

18

Assessment, the third party "Independent Consulting" firms retained by the Banks (and paid for by Owner Plaintiffs) as well as defendants Rafanelli, McClennon and Requarth (Partners Engineering, Partners Assessment, Rafanelli, McClennon and Requarth are, together, the "***Engineering Defendants***" or the "***Independent Consultants***") were all fully aware of the terms of the GMP Contract.  Upon information and belief, the Engineering Defendants knew, or should have known, that the GMP Contract included no allowances, and had no changes in the Scope of Work which would necessitate any Change Orders.

100.    Owner Plaintiffs complained about the Fraudulent Change Orders, but neither Milestone nor the Banks gave Owner Plaintiffs' complaints any credence.

101.    Indeed, throughout the term of the Milestone Contract, Milestone refused to perform under the GMP Contract and threatened to abandon the Project, unless Owner Plaintiffs signed approximately 50 of the 165 Fraudulent Change Orders, which in the aggregate amounted to more than $2,700,000.00.

102.    Notwithstanding that Owner Plaintiffs complained about the Fraudulent Change Orders, since Milestone included such Fraudulent Change Orders on the Requests for Advances submitted to the Banks, the Banks forced Owner Plaintiffs to pay, in order to avoid Milestone's threats of further breaches by terminating the GMP Contract, stopping construction or abandoning the Project, which would have caused Owner Plaintiffs even more money in interest, having to find another contractor and the like.

103.    As of the date of the filing of this adversary proceeding, more than four (4) years after signing the Milestone GMP Contract, and more than two (2) years after the passage of the Extended Substantial Completion Date by which Milestone was to deliver its temporary Certificate of Occupancy, not only is the Building unfinished – it is a health hazard.

104.    As a result of Milestone's negligent construction and its failure to perform the Work in accordance with the Construction Drawings and the Contract as hereafter detailed, and in failing to properly waterproof and provide proper flashings, gaskets, sealants and weatherproof membranes, and in placing excessive loads on terraces and roofs, all in express violation of the Construction Drawings; Construction Details, Construction Specification and architects' and engineers' Construction Notes as published on the building plans, Milestone is responsible for massive water infiltration, resulting in significant growth of Black Mold and other molds, and has become a breeding ground for toxic spores and fungi, which continues to spread on, in and through materials that contain cellulose, including paper products, wood products, drywall, insulation, piping insulation and HVAC ductwork, and other building materials and finishes, resulting in toxicity in the walls, floors, ceilings and other components of the Building, all of which now requires removal, demolition and environmental clean-up, and thereafter a complete re-building of what has been built under the Contract over the past four years, and which is now destroyed and effectively useless.

105.    Milestone failed to construct the Building in accordance with the plans and specifications, and specifically, failed to properly waterproof, flash, and weather protect the Building from the elements.

106.    The more than $80 million invested in this Building by the Owner Plaintiffs is now worthless, as the Owner Plaintiffs will have to completely "gut" the Building, including the penthouse and all roof penetrations, in order to properly construct the Building in accordance with the plans and specifications which Milestone was responsible for, but which they negligently failed to accomplish, and by virtue thereof, caused severe damage.

20

## THE GUARANTEED MAXIMUM PRICE CONTRACT

107.    The GMP Contract signed by the parties for the completion of construction

of the Project, is indeed a true "GMP" contract.

108.    Section 5.2 of the GMP Contract titled "GMP", provides as follows:

"§ 5.2.1 *The Contract Sum is guaranteed by the Contractor not to exceed
Eleven million two hundred thirty-six thousand dollars ($11,236,000.00),*
subject to additions and deductions by Change Order as provided in the
Contract Documents. *Such maximum sum is referred to in the Contract
Documents as the GMP. Costs which would cause the GMP to be exceeded
shall be paid by the Contractor without reimbursement by the Owner.*
(Emphasis added)

109.    The Scope of Work covered by the GMP is set forth in Article 4, which

provides:

"Scope of works include: *Permit, safety, debris remove, PM, operator, site
safety manager, site safety plan, scaffolding, sidewalk shed, protection,
hoist, demolition, site work, sidewalk, paving, steel, deck, slab, masonry,
facade, stair, railing apt door, flooring, tile, kitchen cabinet, appliances,
roofing, waterproofing, roof top & paver, windows installation, storefront,
doors, interior finishes work, compactor, chute, mail box, toilet partition,
bike rack, elevator, plumbing work, sprinkler & standpipe, plumbing
fixtures, vanity, lighting fixtures, HVAC work, electrical, fire alarm, data,
intercom, CCTV, generator, crane, general expenses, GC insurance &
service fee*." (Emphasis added).

110.    There are no exclusions in the Scope of Work.

111.    The GMP Contract has a Schedule of Values attached as a form G-703, and

provides a line-item schedule of values (budget) without any allowances whatsoever:

**AIA DOCUMENT G703**

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT
Contractor's signed Certificate is attached.
In Tabulations below, amounts are stated to the nearest dollar.
Use Column I on contracts where variable RETAINAGE for line items may apply.

Application No.
Application Date: 3/10/2020
Project: 335 W 36 St

| A Item No | B DESCRIPTION | C SCHEDULE VALUE | D WORK COMPLETED Previous Application | E WORK COMPLETED This Period Work In Place | F Total Completed To Date | G % | Balance To Finish | Retainage |
|---|---|---|---|---|---|---|---|---|
| 1 | General Requirement, Safety, Debris remove, PM, Operate | $1,120,100 | $0.00 | $0.00 | $0.00 | 0.00% | $1,120,100.00 | $0.00 |
| 2 | Site Safety Manager, Site Safety Plan | $201,600 | $0.00 | $0.00 | $0.00 | 0.00% | $201,600.00 | $0.00 |
| 3 | Scaffolding, Sidewalk Shed, Protection, Hoist | $200,000 | $0.00 | $0.00 | $0.00 | 0.00% | $200,000.00 | $0.00 |
| 4 | Demolition | $430,000 | $0.00 | $0.00 | $0.00 | 0.00% | $430,000.00 | $0.00 |
| 5 | Site work, Sidewalk, Paving | $70,000 | $0.00 | $0.00 | $0.00 | 0.00% | $70,000.00 | $0.00 |
| 6 | Steel, Deck, Slab, Mason, Façade, Stair, Railing | $580,000 | $0.00 | $0.00 | $0.00 | 0.00% | $580,000.00 | $0.00 |
| 7 | apt door, flooring, tile, Kitchen cabinet, Appliances | $800,000 | $0.00 | $0.00 | $0.00 | 0.00% | $800,000.00 | $0.00 |
| 8 | Roofing, Waterproofing, Roof top, Roof paver | $270,000 | $0.00 | $0.00 | $0.00 | 0.00% | $270,000.00 | $0.00 |
| 9 | Windows installation | $110,000 | $0.00 | $0.00 | $0.00 | 0.00% | $110,000.00 | $0.00 |
| 10 | Storefront, Doors | $150,000 | $0.00 | $0.00 | $0.00 | 0.00% | $150,000.00 | $0.00 |
| 10 | Interior Finishes work | $1,920,000 | $0.00 | $0.00 | $0.00 | 0.00% | $1,920,000.00 | $0.00 |
| 11 | Compactor, Chute, Mail Box, Toilet Partition, Bike reck | $80,000 | $0.00 | $0.00 | $0.00 | 0.00% | $80,000.00 | $0.00 |
| 12 | Elevator | $234,300 | $0.00 | $0.00 | $0.00 | 0.00% | $234,300.00 | $0.00 |
| 13 | Plumbing Work | $600,000 | $0.00 | $0.00 | $0.00 | 0.00% | $600,000.00 | $0.00 |
| 14 | Sprinkler, Standpipe | $700,000 | $0.00 | $0.00 | $0.00 | 0.00% | $700,000.00 | $0.00 |
| 15 | Plumbing fixtures, Vanity, Lighting Fixtures | $260,000 | $0.00 | $0.00 | $0.00 | 0.00% | $260,000.00 | $0.00 |
| 16 | HVAC work | $1,200,000 | $0.00 | $0.00 | $0.00 | 0.00% | $1,200,000.00 | $0.00 |
| 17 | Electrical, Fire Alarm, Data, Intercom, CCTV | $970,000 | $0.00 | $0.00 | $0.00 | 0.00% | $970,000.00 | $0.00 |
| 18 | Generator, Crane | $120,000 | $0.00 | $0.00 | $0.00 | 0.00% | $120,000.00 | $0.00 |
| 19 | Contingency, Violation | $600,000 | $0.00 | $0.00 | $0.00 | 0.00% | $600,000.00 | $0.00 |
| 20 | GC Insurance | $420,000 | $0.00 | $0.00 | $0.00 | 0.00% | $420,000.00 | $0.00 |
| 21 | General Contractor | $200,000 | $0.00 | $0.00 | | 0.00% | $200,000.00 | $0.00 |
| | Total | $11,236,000 | $0.00 | $0.00 | $0.00 | 0.00% | $11,236,000.00 | $0.00 |

112.     There are no allowances identified in the Scope of Work, nor in the Schedule of Values, nor anywhere in the GMP Contract.

113.     The GMP Contract did not anticipate or include any "allowances," and NO allowances were agreed to by the parties, nor included in the Contract for the Project.

114.     Indeed, § 5.2.3 of the Contract requires the specific identification of all allowances, if any, that were to be included in that Contract. That section requires the identification of "***Allowances included in the GMP, if any***." No allowances are identified in § 5.2.3 of the Contract, nor in any other provisions of the Contract, thereby establishing that the parties did not intend to include any "allowances" within the GMP of the Contract. (Emphasis added).

115.     The GMP Contract anticipated that there would be modifications to the construction drawings and specifications and that any such *in-futuro* changes were anticipated and included in the GMP of the Contract.

116.     Section 5.2.5 of the GMP Contract explicitly provides, as long as the Scope of Work does not change, that:

*"[t]o the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Contractor has provided in the GMP for such further development consistent with the Contract Documents and reasonably inferable therefrom.*" (Emphasis Added).

117. Indeed, to reflect the foregoing, at the insistence of the Banks, Milestone updated Section 16.13 to reflect that the Plans and Specifications dated 5/29/2019 and 1/30/2019, were updated by revisions dated 9/18/2020 and 9/24/2020, and initialing same. A copy of the updated Section 16.13 is attached hereto as Exhibit "C".

118. The Work to be performed by Milestone under the Contract was defined in Article 2 of the MP Contract as follows:

*"The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.*" (Emphasis added).

119. Pursuant to Article 1 of the GMP Contract, "[t]he Contract Documents consist of this Agreement Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract and are as fully a part of the Contract as if attached to this Agreement or repeated herein.

120. Article 1 of the GMP Contract goes on to make clear that the GMP "Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. *If anything in the other Contract Documents, other than a Modification, is inconsistent with this Agreement. this Agreement shall govern*". (Emphasis added).

121. Pursuant to Article 17 of the GMP Contract, Frank Ng and Milestone, as Contractor were contractually required to purchase and maintain Commercial General Liability

insurance with coverages of $2,000,000.00 per each occurrence and General Aggregate of $4,000,000, and Excess Liability coverage of $13,000,000.00 per each occurrence and $13,000,000 in aggregate Excess Liability coverage.

122.   Pursuant to Article 4 of the Contract, Frank Ng and Milestone were obligated to commence construction under the Contract upon obtaining the Building Permit, and pursuant to the construction Schedule incorporated into the Contract, Frank Ng and Milestone were to be substantially complete with construction and deliver a Temporary Certificate of Occupancy fifty-four (54) weeks later, or approximately May 3, 2021.

123.   However, the parties recognized that defendants Ng and Milestone would not be able to achieve substantial completion by May 3, 2021, so at the insistence of the Banks, Owner Plaintiffs, without receiving any consideration for same, were put in the position of having to agree to extend Milestone's time to achieve Substantial Completion, to January 19, 2022.

124.   Pursuant to § 16.1.2 of the GMP Contract, the General Conditions in the form of AIA Document A201-2007, were incorporated by reference into the GMP Contract. A copy of said General Conditions AIA Document A201-2007 is attached hereto as Exhibit "D".

## THE GENERAL CONDITIONS PROVISIONS
## OF THE GMP CONTRACT

125.   The General Conditions of the Contract include several important provisions that affect the matters set forth in this Complaint, and they are addressed below.

126.   The term "**_Work_**" is defined in § 1.1.3 of the General Conditions to mean "the construction and services required by the Contract Documents, and includes all other labor, materials, equipment and services provided or to be provided by Milestone as the Contractor to fulfill the Contractor's obligations".

127.   § 1.1.5 of the General Conditions define the "**_Construction Drawings_**" as

"the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams".

128.    § 1.1.6 of the General Conditions defines the "***Specifications***" as "that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services".

129.    § 1.2.1 of the General Conditions provides that the "intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results".

130.    Pursuant to § 3.1.2 of the General Conditions, Frank Ng and Milestone, as the Contractor were required to perform the Work in accordance with the Contract Documents.

131.    Milestone executed the Contract on its own behalf, and as the agent or alter ego of Frank Ng, and § 3.2.1 of the General Conditions expressly provide that "[e]xecution of the Contract by the Contractor ***is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents***". (Emphasis added).

132.    Pursuant to Article 2 of the GMP Contract, Frank Ng and Milestone contracted, promised, and agreed to "fully execute the Work described in the Contract Documents".

133.    Pursuant to § 3.2.2 of the General Conditions, and because the Contract

25

Documents are complementary, Frank Ng and Milestone, as the Contractor were required, "*before starting each portion of the Work, to carefully study and compare the various Contract Documents relative to that portion of the Work, take field measurements of any existing conditions related to that portion of the Work, and observe any conditions at the site affecting it*". (Emphasis added)

134.    Pursuant to § 3.3.2  of the General Conditions Frank Ng and Milestone, as the Contractor were, and remain responsible to the Owner Plaintiffs, as Owner, "for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, the Contractor or any of its Subcontractors".

135.    Pursuant to § 3.3.3 of the General Conditions Frank Ng and Milestone as Contractor were and remain responsible "for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work".

136.    Issac & Stern Architects, P.C, with an office at 264 West 40th Street, PH, New York. NY, was designated the Project Architect (the "*Project Architect*").

137.    Pursuant to § 3.2.2 of the General Conditions, "[b]ecause the Contract Documents are complementary, the Contractor shall, before starting each portion of the Work, carefully study and compare the various Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work, and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating coordination and construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents*; however, the Contractor shall promptly report to the*

*Architect any errors, inconsistencies or omissions discovered by or made known to the Contractor as a request for information in such form as the Architect may require*". (Emphasis added).

138.    Pursuant to § 3.2.4 of the General Conditions, *"[t]he Contractor shall supervise and direct the Work, using the Contractor's best skill and attention.*" (Emphasis added).

139.    Pursuant to § 3.3.2 of the General Conditions "[*t]he Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, the Contractor or any of its Subcontractors*". (Emphasis added).

140.    Pursuant to § 3.3.3 of the General Conditions, "[*t]he Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work*". (Emphasis added).

141.    Pursuant to § 3.4.1of the General Conditions, "*the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work*". (Emphasis added).

142.    Pursuant to § 3.7.1 of the General Conditions "*the Contractor shall secure and pay for the building permit as well as for other permits, fees, licenses, and inspections by government agencies necessary for proper execution and completion of the Work that are customarily secured after execution of the Contract and legally required* at the time bids are received or negotiations concluded". (Emphasis added).

143.    Pursuant to § 3.7.3 of the General Conditions "[*i]f the Contractor performs Work knowing it to be contrary to applicable laws, statutes, ordinances, codes, rules and regulations, or lawful Orders of public authorities, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction*". (Emphasis added).

144.    Pursuant to § 3.9.1 of the General Conditions "[The *t]he Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work.* (Emphasis added).

145.    Pursuant to § 3.18.1 of the General Conditions "[*t]o the fullest extent permitted by law the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work*". (Emphasis added).

146.    Pursuant to § 12.2.1 of the General Conditions, "[*t]he Contractor shall promptly correct Work. . . failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense*". (Emphasis added).

147.    Pursuant to § 12.2.3 of the General Conditions, *"[t]he Contractor shall remove from the site portions of the Work that are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the*

*Owner*." (Emphasis added).

148.    Pursuant to § 12.2.4 of the General Conditions "[*t]he Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work that is not in accordance with the requirements of the Contract Documents*". (Emphasis added).

149.    Pursuant to § 13.4.2 of the General Conditions "*[n]o action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach there under, except as may be specifically agreed in writing*".

## THE BUILDING LOAN AGREEMENTS

150.    The Project's Building Loan Agreements provide, at Section 4.3, that "[t]he Borrower shall provide to [SCB as] Administrative Agent, (a) the identity and qualifications of . . . General Contractor, . . . (c) the most updated Plans and Specifications, and (d) all fully executed . . . . General Contractor's Construction Contracts . . . covering the entire Project. . . . Clauses (c) and (d) of this Section 4.3 are additionally subject to the review of the Independent Consultant with reports provided to Administrative Agent". A copy of the Building Loan Agreement dated October 3, 2017 attached hereto as Exhibit "E"

151.    The Banks selected Frank Ng, and his "Paper GC", Milestone as the General Contractor in March 2020, and therefore was fully aware of the General Contractor's identity.

152.    The Banks were also fully aware of the qualifications of the General Contractor, having introduced the General Contractor to the Owner Plaintiffs and providing

29

glowing recommendations and assurances that the general contractor recommended by the Banks were highly experienced, duly licensed, and capable of timely completing the Work under the GMP Contract.

153.    The Banks received a copy of the General Contractor's GMP Construction Contract covering the entire Project on the same day that it was received by Owner Plaintiffs.

154.    The "Independent Consultant" is defined in the Building Loan Agreement as "[t]hat certain engineering/consultant firm engaged by Administrative Agent, for itself and for the benefit of the Lenders, at the Borrower's cost and expense, and any replacement thereof, to perform project documentation review (including but not limited to the Plans and Specifications, Architect's and Engineer's Contracts), project monitoring as well as the review and approval of requisitions from the General Contractor or sub-contractors as deemed applicable by Administrative Agent, accompanied by regular site visits not less than once every month in connection with the Loan and the Project".

155.    Section 4.6 of the Building Loan Agreements, titled "CONTRACTS", provides: "[a]ll now existing . . . General Contractor's Construction Contracts . . . have been fully executed. The aforementioned contracts are subject to the consents of [SCB as] Administrative Agent in its sole and absolute discretion, and subject to the review of the Independent Consultant with report provided to Administrative Agent. . . Such contracts have been assigned to Administrative Agent pursuant to the Assignment of Contracts, and every party to any such contract (other than the Borrower) shall have given its consent to such assignment in the form required under the Assignment of Contracts, or otherwise . . . Any amendments or changes to the aforementioned contracts are subject to Administrative Agent's consent…Any. . . General Contractor's Construction Contracts . . . which may be entered into after the date hereof shall have

to be in form and substance satisfactory to Administrative Agent in Administrative Agent's sole and absolute discretion."

156.    The Banks received, reviewed and approved the Milestone GMP Contract as the construction contract for the  Project in March 2020.

157.    Based upon the Building Loan Agreements' requirement, the  Independent Consultant – defendants Partners Engineering, Partners Assessment and defendants Rafaella, McClennon and Requarth – had been given copies of the Milestone General Contractor's GMP Contract covering the entire Project, and because the Milestone GMP Contract was "approved" by both the Banks and the Engineering Defendants, both the Banks and the Engineering Defendants have had to have complied with their respective obligations to review the Milestone GMP Contract prior to approving same, and having reviewed same, both the Banks and the Engineering Defendants approved same.

158.    Having reviewed the terms of the GMP Contract, the Banks and the Engineering Defendants read the following provisions of the GMP Contract:

(i)     **at "§ 5.2.1** – "the maximum sum is referred to in the Contract Documents as the GMP. Costs which would cause the GMP to be exceeded shall be paid by the Contractor without reimbursement by the Owner";

(ii)    **at Article 4** – "Scope of works include: Permit, safety, debris remove, PM, operator, site safety manager, site safety plan, scaffolding, sidewalk shed, protection, hoist, demolition, site work, sidewalk, paving, steel, deck, slab, masonry, facade, stair, railing apt door, flooring, tile, kitchen cabinet, appliances, roofing, waterproofing, roof top & paver, windows installation, storefront, doors, interior finishes work, compactor, chute, mail box, toilet partition, bike rack, elevator, plumbing work, sprinkler & standpipe, plumbing fixtures, vanity, lighting fixtures, HVAC work, electrical, fire alarm, data, intercom, CCTV, generator, crane, general expenses, GC insurance & service fee";

(iii)   **at "§ 5.2.3** – "Allowances included in the GMP, if any:", with no allowances thereafter identified, hereby establishing that the parties did not intend to include any "allowances" within the GMP of the GMP Contract;

(iv) **at Article 1** – "The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings. Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement *and Modifications issued after execution of this Agreement, all of which form the Contract and are as fully a part of the Contract as if attached to this Agreement or repeated herein"*;

(v) **at § 1.1.3 (General Conditions)** – "Work" is defined as "the construction and services required by the Contract Documents, and includes all other labor, materials, equipment and services provided or to be provided by Milestone as the Contractor to fulfill the Contractor's obligations";

(vi) **at § 1.2.1 (General Conditions)** – "the intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor . . . to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results";

(vii) **at § 3.3.3 (General Conditions)** – "The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work";

(viii) **at § 3.4.1 (General Conditions)** – "the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and manery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work";

(ix) **at § 3.7.1(General Conditions)** – "The Contractor shall secure and pay for the building permit as well as for other permits, fees, licenses, and inspections by government agencies"; and

(x) **at § 12.2.1 (General Conditions)** – "The Contractor shall promptly correct Work . . . failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion . . . Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement . . . and expenses made necessary thereby, shall be at the Contractor's expense"

159.    Clearly, the GMP Contract herein was a GMP Contract -- there were no allowances provided in the GMP Contract, and that the Scope of Work unambiguously covered everything on the Construction Drawings, the plans and specifications, construction details, all within the agreed GMP.

160.    At no time did the GMP Contract, as written, authorize, permit or even anticipate any Change Orders.

161.    Pursuant to Section 4.4 of the Building Loan Agreements, "The Borrower shall provide to [SCB as] Administrative Agent an estimated project schedule for the construction of the Improvements and a detailed breakdown of the hard costs and soft costs of construction (the "Cost Breakdown") and the Final Budget. . . . Any changes in the Final Budget shall be subject to the review and consent or approval of [SCB as] Administrative Agent in its sole and absolute discretion, and the changes shall be subject to the review of the Independent Consultant Report provided to Administrative Agent".

162.    The GMP Budget -- or, more appropriately, the Schedule of Values allocating the GMP -- was never changed from the original one attached to the GMP Contract.

## LOAN ADVANCES UNDER THE BUILDING LOAN AGREEMENTS

163.    Pursuant to Section 5.1 (e) of the Building Loan Agreements, the Banks clearly agreed with Owner Plaintiffs, and Owner Plaintiffs had every right to rely on the Banks' covenants, agreements and promises that "***each Request for Advance will be funded within five (5) Business Days of Administrative Agent's receipt of all required documents***".   (Emphasis Added).

164.    At no time during the approximately four (4) years that Milestone was on the Project did the Banks comply with the above quoted contractual promise, to Owner Plaintiffs' and the Project's detriment.

165.    Moreover, section 7.2 of the Building Loan Agreements ***contractually prohibit any changes or change Orders which "affect…construction . . . of the Project or any other change Orders, without the prior written consent of [SCB as] Administrative Agent***".

33

(Emphasis Added).

166.    At no time during the approximately four (4) years that Milestone was on the Project did Owner Plaintiffs initiate, or agree to an Architect prepared Change Order, nor request that defendant Banks ever approve a Change Orders, because the GMP Contract included everything on the Contract Documents and the Construction Drawings.

167.    Indeed, a "Change Order" as defined by the GMP Contract at Section 7.2.1 of the GMP Contract's General Conditions, makes clear that a "Change Order" can only be prepared by the Architect, not the General Contractor. § 7.2.1 provides:

> "A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect stating their agreement upon all of the following:
> 1.  The change in the Work;
> 2.  The amount of the adjustment, if any, in the Contract Sum; and
> 3.  The extent of the adjustment, if any, in the Contract Time.

168.    Moreover, § 4.2.8 of the GMP Contract's General Conditions, provides that it is only "[t]he Architect [who can] prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4."

169.    Additionally, § 7.3.10 of the GMP Contract's General Conditions, provides: "When the Owner and Contractor **agree with a determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach** agreement upon the adjustments, such agreement shall be effective immediately **and the Architect will prepare a Change Order**." (Emphasis added).

170.    Were the foregoing provisions not sufficiently clear to the reader, § 7.1.2 of the GMP Contract's General Conditions, provides that a "***Change Order shall be based upon agreement among the Owner, Contractor and Architect***".

171.    At no time during the term of the Milestone GMP Contract did the

Architect issue a Change Order signed by the Owner Plaintiffs, which identified any changes in the Work, the amount of adjustment, if any, in the GMP Contract Sum, and the extent of any adjustment of the Contract Time. As such there have never been any Change Orders issued with respect to the Project during the term of the Milestone GMP Contract.

172.    At no time during the term of the Milestone GMP Contract did the Banks provide their "prior written approval" for any proposed Change Order for the Project.

173.    Upon information and belief, Milestone, upon reading the above quoted provisions of the GMP Contract, would understand that a request (or demand) made by the contractor, which does not meet the requirements to qualify as a Change Order, is simply not a change Order.

174.    As such there were no properly made Change Orders issued under the Milestone GMP Contract.

175.    Milestone's demands (even if they were wrongfully supported by the Banks, or approved by the negligent Independent Consultants), did not create a Change Order which qualified as such under the terms of the Milestone GMP Contract.

176.    It is inconceivable that a competent banker and a qualified engineer or competent project manager, who was tasked with undertaking a project documentation review -- which would have to include in this instance the Building Loan Agreements, the Milestone GMP Contract, and the Plans and Specifications for the Project -- could reasonably conclude that the GMP Contract was anything other than a true "Guaranteed Maximum Price Contract", where the Owner Plaintiffs would have NO obligation or responsibility to pay any sums in excess of the GMP, and where it was expressly agreed that any costs in excess of the true GMP was the sole responsibility of the General Contractor – not the Owner Plaintiffs.

## THE INDEPENDENT CONSULTANTS

177.    According to their website, https://www.partneresi.com/, the Engineering

Defendants motto is "**WIN WITH PARTNERS**",  and they describe the firm as:

"the leading provider of engineering, environmental, construction, energy, and valuation consulting for the commercial real estate industry. We help our clients manage risk, make smart investments, optimize asset performance, and *win* at their real estate investment strategies. When you work with Partner, you get:

- The confidence of working with the trusted choice
- A single point of contact who listens and understands your objectives
- Access to 1300+ multidisciplinary professionals across the globe
- A team and technology tailored to your goals
- A *Partnership* between science, business, and you

At Partner, we understand that good science is only part of the job. Listening to our clients is equally important. We take the time to understand your objectives and the nuances of each project. Drawing on our multidisciplinary suite of services, we tailor our approach to meet your goals.


More than just assessments - *solutions*. The science of real estate is complex. To understand and address complex technical challenges, you need a team that does *more*. Partner's truly multidisciplinary team provides deep expertise on every aspect of a property, from top to bottom. And, if needed, we provide a full suite of solutions because we know our job isn't over when we find a problem; it's when we solve it.

Experience you can trust. Partner has deep expertise on every asset type, at every stage of the real estate lifecycle, and from every angle – from due diligence to asset management, from assessment through implementation, and from complex multi-scope evaluations  of a single site to large-scale portfolios. No matter how large or how small, chances are we've tackled a project just like yours."

178.    The Building Loan Agreement tasked the Independent Consultants with (i)

performing a project documentation review; (ii) monitoring the Project, inclusive of monthly site

inspections to evaluate the progress of the Work being performed by the Contractor; and (iii)

reviewing the accuracy and approving Requests for Advances in accordance with the Milestone

GMP Contract and the Building Loan Agreements (the "**Consulting Duties**").

36

179.    The Engineering Defendants either failed to perform their Consulting Duties, or, if they actually attempted to undertake them, they failed to do so with the skill and care one would expect of a reasonably competent Engineer, Architect or Project Manager tasked with the same Consulting Duties, and failed to meet the minimum skill and standards within the industry, and as such, the Engineering Consultants were negligent and/or reckless, and committed professional malpractice.

## **THE INDEPENDENT CONSULTANTS' NEGLIGENT REPORTS**

180.    Owner Plaintiffs have obtained two (2) of the monthly reports which the Engineering Defendants ostensibly prepared in attempting to fulfill their Consulting Duties – one as of April 2022 (a copy of which is attached as Exhibit "F" hereto), and the other as of April 2023 (a copy of which is attached as Exhibit "G" hereto)[8.]

181.    Based on a review of these two reports, it is clear that the Engineering Defendants either knowingly conspired with the Milestone and/or the Banks and the individual employee defendants, to defraud the Owner Plaintiffs, or were so incompetent, that after allegedly undertaking a Project documents review, they did not understand the terms of the Milestone GMP Contract, nor the Building Loan Agreements, and negligently, or recklessly, failed to protect the Banks and the Owner Plaintiffs (who were paying the Engineering Defendants), by wrongfully approving Fraudulent Change Orders.

182.    When the Banks refused to pay qualified Building Loan Costs out of the Building Loans, they further breached their duty of care and wrongfully withheld such payments, in express violation of the Building Loan Agreements, without any authority for same, and as

---

[8] Owner Plaintiffs expect, during discovery, to obtain all of the sixty (60) reports which the Engineering Defendants were obligated to provide after inspecting the Project and monitoring the progress of construction, and Owner Plaintiffs reserve the right to amend this Complaint as a result thereof.

Owner Plaintiffs assert, on information and belief, that the Engineering Defendants either were working with the Banks' employee defendants and/or Milestone, or did understand the Project documents, but were financially incentivized by, or were threatened by, the individual Bank's employee defendants, or threatened that they would be fired if they did not follow instructions from Milestone and/or the individual Bank's employee defendants, or because they were so terribly inept and incompetent.

183.    Either way, the Engineering Defendants' actions or inactions as herein described caused Owner Plaintiffs significant losses and damages for which they must be held liable.

184.    A review of the Engineering Defendants' April 2022 Independent Consultants Report reveals that as of the 10th Request for Advance under the Milestone GMP Contract (Requisition #10) the aggregate amount of approved Fraudulent Change Orders amounted to $1,095,897.06.

185.    As for one example, out of a multitude of similar errors in the two Independent Consultant Reports reviewed by Owner Plaintiffs -- notwithstanding that the GMP Scope of Work includes all labor, materials, equipment and supervision for all "flooring, tile, kitchen cabinet, appliances" (see Article 4 of the GMP Contract) -- the April 2022 Independent Consultants Report provides, at section 2.6 thereof, titled "Potential Change Orders", the following Engineering Defendants' analysis:

> "As reported in Application #10, Line 7 - ***Kitchen cabinet, Appliances, Tile, Flooring materials***: This line item is now at 100% and final payments for appliances and countertops have not been submitted at this time. ***The Order of magnitude for remaining items on this line is unknown at the time***".

186.    The fact that the Engineering Defendants wrote those words evidences that

they do not understand how a GMP Contract, and especially how the Milestone GMP Contract, is supposed to work.

187.    By virtue of the Engineering Defendants statement as above quoted, it is clear that they have confused the GMP Schedule of Values -- which allocates the GMP proportionately among all the Schedule of Values Line Items (which are the same line items making up the Scope of Work) against which Requests for Advances are drawn to determine the amount which each Draw represents out of the GMP under the GMP Contract.

188.    In other words, if a Schedule of Values line item is at $500,000.00, and the Independent Consultant, in a monthly monitoring site visit in advance of approving a submitted Request for Advance, determines that the Work as set out in the Plans and Specifications is 47% complete, and the general contractor has requested $275,000 against that line item in total through the date of  the current Request for Advance, then a competent Independent Consultant would CUT THAT LINE ITEM BACK TO $235,000 (less retainage) because the Work for that line item is only 47% complete.

189.    But the defendant Engineers did not do that, they negligently, or recklessly, used the Schedule of Values, not as the GMP under the GMP Contract, with the General Contractor solely responsible for all costs in excess of the GMP, but rather as the "allowance" budget for that line item, so that when the full amount of any line item is Requested by the General Contractor, it is simply paid as requested, and when the costs of any line item exceeds the budgeted allowance, the Owner Plaintiff is responsible to pay a change Order. and that is simply not correct.

190.    The appropriate way of approving a Request for Advance pursuant to the terms of the Milestone GMP Contract and the Building Loan Agreements, is by allocating the

39

percentage of completion of Work called for by the Plans and Specifications which has actually been completed as of each monthly monitoring site inspection, multiplied against the Schedule of value Line Item for that component of the Scope of Work.  The purpose is to limit the amount which may be approved for payment to not more than the Guaranteed Maximum amount of that line item multiplied by the percentage which the Independent Consultant reasonably estimates as representing the percentage of the total Work required by the Plans and Specifications for that particular line item, less retainage, and that is not what the Engineering Defendants did.

191.    Contrary to the Engineering Defendants incorrect analysis, the Milestone GMP Contract provides that every dollar that the General Contractor spends in excess of the line item amount in the GMP Schedule of Values -- is the responsibility of the CONTRACTOR, not the Owner Plaintiffs.

192.    Engineering Defendants got it backwards.

193.    And so did the Banks.

194.    The Engineering Defendants' April 2022 Inspection Report stated that the Work on the Project was 59% complete.  As such, the Engineering Defendants, had they properly undertaken their Consulting Duties, would have limited the Advance requested to NO MORE than 59% of each Schedule of Values Line Item, and any and all costs in excess of 59% would have to be borne by Milestone as the General Contractor.

195.    But that is not what the Engineering Defendants did.

196.    The Engineering Defendants' April 2022 Inspection Report wrongfully included more that $1 million in  the following Fraudulent Change Orders:

(i)    **Insurance, $20M premium -- $ 92,984.39,** when the Scope of Work and the terms of the Milestone GMP Contract included  all "*insurance*";

(ii)    **Insurance premium financing cost - $ 2,206.88,** when the Scope of

Work and the terms of the Milestone GMP Contract included all "*insurance*";

(iii)  <u>**A&H Scaffolding, March to July/20, Permit, 4/7/21 - $ 90,133.55,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "*scaffolding*"; and all "*permits*";

(iv)  <u>**A&H scaffolding, July to Oct, SWO, 10/26/20 - $ 59,960.22,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "*scaffolding*";

(v)  <u>**A&H scaffolding, 2/4/2021 A, S plan revision - $50,251.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included "*scaffolding*" and "*plan revisions*";

(vi)  <u>**A&H scaffolding, Roof steel revision - $ 64,980.00**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "*scaffolding*";

(vii)  <u>**A&H scaffolding, July, Aug 21 roof slab - $ 36,120.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "*scaffolding*";

(viii)  <u>**Needle beam, scaffolding 9/7/21 - $ 43,274.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "*scaffolding*";

(ix)  <u>**Shed revision - $ 13,556.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "*sidewalk Shed*";

(x)  <u>**Roof protection repair, 8/5/21 - $5,280.44,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "*Roof*" and all "*protection*";

(xi)  <u>**Roof 4" relief concrete slab 6/28/21 - $78,300.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "*Roof*" and the "*slab*" and all "*masonry*";

(xii)  <u>**Mason & façade restoration 8/11/21 - $18,000.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "*facade*" and "*masonry*";

(xiii)  <u>**Steel work, 9/24/20 A, S Plan revision 12/2/20 - $23,540.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "*steel*" and "*plan revisions*";

(xiv)  <u>**Steel work, 2/4/2021 A, S Plan revision 2/17/20 - $9,328.00,**</u> when the

Scope of Work and the terms of the Milestone GMP Contract included all "***steel***" and "***plan revisions***";

(xv) <u>**Roof steel replace extra work 6/28/21 - $10,600.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "***steel***";

(xvi) <u>**Metal Panel Shop Drawings 4/8/21- $ 2,790.00, -**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "***stairs***" and all "***shop drawings***";

(xvii) <u>**Penthouse Temporary waterproofing 8/25/21 - $9,568.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "***waterproofing***";

(xviii) <u>**roof revision, temp waterproofing - $84,002.88,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "***roof***" and all "***waterproofing***";

(xix) <u>**Window 3F to 12F installation extra cost 6/22/21 - $39,630.50,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "***windows installation***" and all "***labor***" and "***plan revisions***;

(xx) <u>**Mold resist sheetrock - $51,500.00,**</u> when the Construction Drawings and specifications call for "***waterproof/mold resistant drywall***";

(xxi) <u>**Demo elevator permit 1/5/21 - $945.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "***elevators***", and all "***demolition***" and "***all permits***";

(xxii) <u>**Elevator shaft reinforcement work 7/9/21 - $7,696.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included the "***elevators***" and "***all labor***";

(xxiii) <u>**TKE inspection damages equipment 8/5/21 - $5,667.20, -**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "***inspections***" and "***all equipment***" and the contractor's responsibility to repair or replace all damaged equipment, and cover "***all labor***" and "***plan revisions***;

(xxiv) <u>**TKE Overtime 9/21/21 - $6,936.00, -**</u> when the Scope of Work and the terms of the Milestone GMP Contract *included* all "***labor***";

(xxv) <u>**Extra roof drain, 6/28/21 - $16,640.00,**</u> when the Scope of Work and the terms of the Milestone GMP Contract included all "***plumbing fixtures***" and *the "**roof**"*;

42

(xxvi) **Extra roof drain (credit adjustment)- $(10,400.00),** when the Milestone GMP Contract gives ***all cost savings*** to the Contractor*;*

(xxvii) **Dry sprinkler system, 2nd fl terrace - $16,120.00,** when the Scope of Work and the terms of the Milestone GMP Contract included all ***"sprinklers" and all "plumbing fixtures";***

(xxviii) **Hot water heater replacement - $17,683.00,** when the Scope of Work and the terms of the Milestone GMP Contract included all ***"equipment", and all "plumbing fixtures";***

(xxix) **Relocate AC and pipe as revised plan 5/21/21 - $50,024.00,** when the Scope of Work and the terms of the Milestone GMP Contract included all ***"HVAC" and "all labor" and all "plumbing work";***

(xxx) **Additional outlet 5/25/21 - $55,068.00,** when the Scope of Work and the terms of the Milestone GMP Contract included all ***"electrical";***

(xxxi) **Fire Alarm plan revision, ARCS room 3/14/21 -$19,210.00,** when the Scope of Work and the terms of the Milestone GMP Contract included all ***"fire alarm",  "all labor" and "plan revisions;***

197.    By virtue of the negligence, recklessness or willful wrongful acts of the Engineering Defendants and the Banks in authorizing the above listed Fraudulent Change Orders, put in motion a series of events which had significant negative impact on the Project and the value of the collateral, in that (i) every attempt at including a Change Order delayed the Work; (ii) because the Banks refused to pay any Request for Advance with a change Order on it until the Owner Plaintiffs (a) evidenced to the Banks they had the additional liquid assets to pay same (even though they were contractually not required to pay a single one of the above Fraudulent Change Orders) the Banks and the Engineering  defendants delayed the Project; (iii) the Banks's refusal to pay legitimate Building Loan Costs out of the Building Loan, and the Banks' wrongful coercion of the Owner Plaintiffs to pay for Fraudulent Change Orders reduced the cash of the Purported Guarantors, put at risk the Lafayette Street Property, and caused the Project to remain unfinished and without Substantial Completion by the Substantial Completion Date under the

Milestone GMP Contract, and maturity of the Loan.

198.    In addition to reviewing and approving payment requisitions, the Engineering Defendants, in their role as the Independent Consultants, were contractually obligated to (i) perform a project documentation review, including but not limited to the Plans and Specifications; and (ii) monitoring the progress of the project and conduct "regular site visits not less than once every month" in connection with the Loan and the Project.

199.    The Engineering Consultants failed to properly perform a project documentation review, or they negligently undertook same, as a proper project documentation review would have required the Engineering Defendants to read the GMP Contract, and compare it to the Project's Plans and Specifications, which, had they done so, would have revealed (a) that all the Work for which the general contractor submitted Change Orders were clearly included in the Scope of Work covered by the GMP Contract and the Fraudulent Change Orders should properly been rejected; and (b) a competent Engineer, Architect or Project Manager should have been able to determine that the Work being undertaken on the Project did NOT conform to the Project's Plans and Specifications, and a competent Engineer, Architect or Project Manager would have identified the discrepancy (and there were many) and required that the Contractor correct all defective Work.

200.    However, the Engineering Defendants failed to undertake a proper project documentation review, failed to coordinate the Scope of Work under the Contract Documents with the Plans and Specifications, and by failing to so do, the Engineering Defendants breached their Agreement with Banks – for which the Owner Plaintiffs paid, and Plaintiffs were always third party beneficiaries of same, and by their breaches as above set forth, the Engineering Defendants caused Owner Plaintiffs loss and damages.

201.    Even worse, because the Engineering Defendants were contractually bound to conduct "regular site visits not less than once every month in connection with the Loan and the Project", over the 48 months during which Milestone worked on the Project, the Engineering Defendants should have seen, and identified, the negligent construction for which Milestone was responsible, and the defective construction which resulted, and identifying the appropriate actions necessary for Milestone to correct the defective Work in accordance with the GMP Contract and the Engineering Defendants' Consulting Duties, but they failed to do so.

202.    As a result of the Engineering Defendants' failure to properly undertake their Consulting Duties, and their failure to identify Milestone's negligent construction and failure to identify the resultant defective work which needed to be removed and repaired, the Engineering Defendants are responsible for, and should be held jointly and severally liable for the resulting water infiltration, and then continuing damages which resulted therefrom.

## THE GENERAL CONTRACTOR'S NEGLIGENT CONSTRUCTION WHICH THE ENGINEERING DEFENDANTS FAILED TO IDENTIFY

203.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone was contracted to perform, including, without limitation, Structural Construction Drawing S -103.02, which provided "NEW TERRACE - MAXIMUM WEIGHT OF FINISHES = 30 POUNDS PER SQUARE FOOT. ALL EXISTING SLABS, WALLS AND COLUMNS INCLUDING UNDERSIDE OF SLAB AND BEAMS ABOVE SHALL RECEIVE WATERPROOF ENCLOSURE OR PROTECTIVE SEALANT PER ARCHITECTURAL SPECIFICATIONS" which note was incorporated into the following Construction Drawing relating to the construction of the new terrace:



204.    Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to waterproof, enclose or install protective sealants at all existing slabs, walls and columns including underside of slab and beams in connection with its construction of the new terrace in express violation of the Contract.

205.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

206.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Structural Construction Drawing S -114.02, which provided: "W8 x 31 COLUMN ON EXISTING BEAM SEE DETAIL 10/S201 WATERPROOF PER ARCH'L. DWG'S", which note was incorporated into the following Construction Drawing:



207.    Milestone failed to conform to the requirements of the Contract Documents in that Milestone, failed to waterproof W8 x 31 column on existing beam in express violation of the Contract.

208.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

209.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Structural Construction Drawing S -201.01, which provided a Waterproofing Detail 4-S02:



210.    Milestone failed to conform to the requirements of the Contract Documents in that Milestone failed to follow the Waterproofing Detail in express violation of the Contract.

211.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

212.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Structural Construction Drawing S -301.01, which provided a Typical Railing Detail requiring the removal of the slab in area of post fill pocket with concrete or grout and waterproof per Architect's Drawings, as follows:



213.    Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to remove the slab in area of post and fill pocket with concrete or grout and waterproof per Architect's Drawings in express violation of the Contract.

214.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

215.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, following the Flashing Detail 10 S201, on the Structural Construction Drawing S - S 201.01, which provided for flashing and finishes in accordance with the Architectural drawings as follows:



216.    Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to provide such flashing in express violation of the Contract.

217.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

218.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, following the Flashing Detail 11 S201, on the Structural Construction Drawing S - S 201.01, which provided for flashing and finishes in accordance with the Architectural drawings as follows:



219.    Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to provide flashing in express violation of the Contract.

220.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

221.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was  contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Architectural Construction Drawing A 101.03 – by failing to comply with specific Construction Note 3, requiring Milestone to provide a waterproofing membrane under bathrooms, turned up vertically 6" at wall intersections, and Note 6, requiring Milestone to install a roofing membrane with 10 years warranty, pursuant to the Specifications, and provide metal flashing, turned up vertically at all intersection with the roof as set forth in the following Construction Notes:

CONSTRUCTION NOTES

1. ALL APARTMENT FLOORS TO RECEIVE HARDWOOD FLOORING WITH EXCLUSION OF BATHROOMS.

2. INSTALL CERAMIC TILE OR MARBLE (COORD. W/OWNER) ON FLOOR  AT BATHROOMS.

3. PROVIDE W.P. MEMBRANE UNDER BATHROOMS, TURN UP VERTICALLY 6" AT WALL INTERSECTIONS.

4. ALL GYPSUM BOARD PARTITIONS AT BATHROOMS TO BE WATER RESISTANT.

5. PROVIDE MECHANICAL VENTILATION OF 50 CFM FOR BATHROOMS.

6. INSTALL ROOFING MEMBRANE WITH 10 YEARS WARRANTY, SEE SPECIFICATIONS. PROVIDE METAL FLASHING, TURN VERTICALLY AT ALL INTERSECTION WITH ROOF.

7. PROVIDE METAL COPING AT ALL ROOF PARAPETS AS SHOWN ON DETAILS.

8. INSTALL THERMAL BREAK INSULATED WINDOWS WITH DOUBLE GLAZING AND ALUMINUM ANODIZED FRAME. WINDOWS TO BE 1" LESS IN SIZE THAN ROUGH MASONRY OPENING AS INDICATED ON PLAN.

9. ALL ROOF EQUIPMENT TO HAVE VIBRATOR SOUND INSULATOR.

10. ALL TOILET EXHAUSTS TO HAVE 1 HR FIRE DAMPER AT EACH FLOOR.

11. ALL BATHROOMS SHALL COMPLY WITH NYC-BC.

12. ALL BUILDING ENTRANCES, EXITS AND EXIT STAIRWAYS SHALL BE PROVIDED WITH DIRECTIONAL SIGNAGE INDICATING THE ROUTE TO THE NEAREST EGRESS ELEMENT. ACCESSIBLE MEANS OF EGRESS SHALL BE IDENTIFY WITH TACTILE CHARACTER SIGNAGE AND BRAILLE.

222.    Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to comply with Construction Notes 3 and 6 on Drawing A 101.03 in express violation of the Contract.

223.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

224.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Structural Construction Drawing EN 102.01, which provided for BULKHEAD TYPE "K" DETAIL: BITUMINOUS MEMBRANE OVER FLASHING CEMENT OR ASPHALT ON ROOF MEMBRANE ON 6" MIN. R34.8 RIGID INSULATION, as follows:



225.    Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to provide a bituminous membrane over flashing cement or asphalt on roof membranes on 6" min. r34.8 rigid insulation for wall type F in express violation of the Contract.

226.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

227.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Structural Construction Drawing EN 102.01, which provided for BULKHEAD TYPE "L" DETAIL: BITUMINOUS MEMBRANE OVER FLASHING CEMENT OR ASPHALT ON ROOF MEMBRANE ON 6" MIN. R34.8 RIGID INSULATION, as follows:



228.     Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to provide a bituminous membrane over flashing cement or asphalt on roof membranes on 6" min. r34.8 rigid insulation for wall type N in express violation of the Contract.

229.     The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

230.     The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Construction Drawing A 502.01, which provided for a WATERPROOFING MEMBRANE OVER TAPERED POLYISO INSUL. SLOPED TO DRAIN, as follows:



231.    Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to install a waterproofing membrane over tapered polyiso insul. sloped to drain in express violation of the Contract.

232.    The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

233.    The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Architectural Construction Drawing A 502.01, which provided a DETAIL B: for Wall Type "T", which required a WATERPROOFING MEMBRANE OVER TAPERED POLYISO INSUL. SLOPED TO DRAIN in Wall Type "T" as follows:



234.     Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to install a waterproofing membrane over tapered polyiso insul. sloped to drain for Wall Type "T" in express violation of the Contract.

235.     The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

236.     The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Construction Drawing EN 102.01, which provided in a Section Detail at New Roof for SURFACE CONDITIONER OVER MONOLITHIC MEMBRANE OVER SEPERATION SHEET OVER MIN. 6" MIN. R34.8 TAPPERED RIGID INSULATION, as follows:



237.   Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to install surface conditioner over monolithic membrane over separation sheet over min. 6" min. r34.8 tapered rigid insulation at New Roof, in express violation of the Contract.

238.   The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

239.   The Construction Drawings provide specific construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Architectural Construction Drawing A 502.01, which provided a DETAIL B: for Wall Type "N", which required a WATERPROOFING MEMBRANE OVER TAPERED POLYISO INSUL. SLOPED TO DRAIN in Wall Type "N" as follows:



240.     Milestone failed to conform the Work to the requirements of the Contract Documents in that Milestone failed to install a waterproofing membrane over tapered polyiso insul. sloped to drain for Wall Type "N" in express violation of the Contract.

241.     The Engineering Defendants should have identified the foregoing negligent construction, and the resultant defects, and the means and methods to correct same as part of their Consulting Duties, and pursuant to the tasks they were charged with under the Building Loan Agreements, but which they failed to do.

242.     Pursuant to § 3.5 of the General Conditions, defendants Milestone ***expressly warranted that the Work will conform to the requirements of the Contract Documents and will be free from defects,*** except for those inherent in the quality of the Work the Contract Documents require or permit. (Emphasis added).

243.     Notwithstanding the extensive defective Work resulting from Milestone's negligent construction as above detailed, nowhere in the Independent Consultant Reports which Owner Plaintiffs have obtained, did the Engineering Defendants identify the defective work, or caution the Banks and the Owner Plaintiffs of the gestating problems which a competent Engineer,

Architect or Project Manager should have known would lead to severe physical damage if not properly and timely corrected.

244.    With respect to the April 2023 Independent Consultant's Report, it similarly included the same Fraudulent Change Orders which were wrongfully included in the April 2022 Report, plus an additional $350,000.00+/- of unjustifiable Fraudulent Change Orders; and similarly failed to identify the negligent work of the contractor and the damage to the Building.

245.    The Engineering Defendants' failure to undertake a proper project document review; failure to read or understand the Milestone GMP Contract, and misconstruing the respective obligations and payment responsibilities of the General Contractor and the Owner; failing to compare the Scope of Work in the GMP Contract and comparing it with the Work being performed on the Project site, and failing to notice and identify the numerous deviations of the actual Work to the Construction Drawings and Plans and Specifications under the GMP Contract, and incorporate same into the Independent Consultants monthly reports and caution the Banks, the Owner Plaintiffs, and the contractor of said defects and contractual requirements to remediate same at the general contractor's sole costs and expense constitutes negligence and professional malpractice on the part of the Engineering Defendants.

**THE FRAUDULENT CHANGE ORDERS**

246.    During the course of the performance of the Work, Milestone issued one hundred sixty-five (165) Fraudulent Change Orders seeking to wrongfully enrich themselves at the expense of Owner Plaintiffs for millions of dollars, by fraudulently claiming that those 165 change Orders were for Work not covered by the Scope of Work under the Contract, when in fact, Milestone knew, or should have known, that the Work set forth in each such Change Order was

indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP.

247.    The Banks, as Administrative Agent, the Banks employees acting as such, and the Engineering Defendants upon information and belief knew, or should have known, that if any person had responsibility for cost over-runs, it was Milestone as the General Contractor under the express terms of the GMP Contract, not Owner Plaintiffs.

248.    As such, the Banks, as Administrative Agent, the Banks employees acting as such, and the Engineering Defendants, each breached their respective duties of care and contractual undertakings by such failures.

249.    The Building Loan Agreement clearly sets forth which costs qualify for payment out of the loan proceeds, it defines "***Building Loan Covered Costs***" as "[t]he costs of the construction of the Improvements on the Property to the extent any of the same constitute a "***cost of improvement***" as such term is defined in the Lien Law of the State of New York".

250.    The Lien Law of the State of New York, <u>*New York Consolidated Laws, Lien Law - LIE § 2,*</u>  defines the "**cost of improvement**" as:

> "The term "cost of improvement," when used in this chapter, means expenditures incurred by the owner in paying the claims of a contractor, an Architect, engineer or surveyor, a subcontractor, laborer and materialman, arising out of the improvement, and in paying the amount of taxes based on payrolls including such persons and withheld or required to be withheld and taxes based on the purchase price or value of materials or equipment required to be installed or furnished in connection with the performance of the improvement, payment of taxes and unemployment insurance and other contributions due by reason of the employment out of which any such claim arose, and payment of any benefits or wage supplements or the amounts necessary to provide such benefits or furnish such supplements, to the extent that the owner, as employer, is obligated to pay or provide such benefits or furnish such supplements by any agreement to which he is a party, and shall also include fair and reasonable sums paid for obtaining building loan and subsequent financing, premiums on bond or bonds filed pursuant to section thirty-seven of this chapter or required by any such

60

building loan contract or by any lease to be mortgaged pursuant thereto, or required by any mortgage to be subordinated to the building loan mortgage, premiums on bond or bonds filed to discharge liens, sums paid to take by assignment prior existing mortgages, which are consolidated with building loan mortgages and also the interest charges on such mortgages, sums paid to discharge or reduce the indebtedness under mortgages and accrued interest thereon and other encumbrances upon real estate existing prior to the time when the lien provided for in this chapter may attach, sums paid to discharge building loan mortgages whenever recOrderd, taxes, assessments and water rents existing prior to the commencement of the improvement, and also those accruing during the making of the improvement, and interest on building loan mortgages, ground rent and premiums on insurance likewise accruing during the making of the improvement.   The application of the proceeds of any building loan mortgage or other mortgage to reimburse the owner for any payments made for any of the above mentioned items for said improvement prior to the date of the initial advance received under the building loan mortgage or other mortgage shall be deemed to be an expenditure within the "cost of improvement" as above defined;  provided, however, such payments are itemized in the building loan contract and/or other mortgage other than a building loan mortgage, and provided further, that the payments have been made subsequent to the commencement of the improvement",

251.    Based on the above quoted definition, each and every of the Fraudulent Change Orders would clearly qualify as Building Loan Covered Costs, and would properly have been paid out of the unused Building Loan.

252.    If the 165 Fraudulent Change Orders were legitimate, and therefore permissibly approved, they would qualify to be paid out of the Building Loan unused funds, and the Banks failure to do so would constitute yet another Breach of the Building Loan Agreements.

253.    By contrast, if any of the 165 Fraudulent Change Orders (including the 50 which the Banks and the Engineering Defendants claim to have authorized) were not legitimate, then their authorizing such payments, and requiring the Owner Plaintiffs to pay same from funds other than the proceeds of the Building Loans, is also a breach by the defendant Banks of the Building Loan Agreements.

254.    By approving and authorizing Change Orders in express violation of the

61

GMP Contract, and by failing to properly monitor the Work being performed under the GMP

Contract by Milestone, the Banks, as Administrative Agent, the Banks' employees acting as such,

and the Engineering Defendants, each caused the Owner Plaintiffs damages, in that: (i) They

wrongfully required Owner Plaintiffs to pay for costs for which Owner Plaintiffs were not

responsible to pay; and (ii) in express violation of the Building Loan Agreements – which (i) on

their face prohibited any Change Orders not brought by the Owner Plaintiffs to the Banks for pre-

approval; and (ii) provided that the use of funds of the Building Loans are properly used for any

item which is a "cost of improvement" as defined in the NY Lien Law -- The Banks, as

Administrative Agent, and the Banks employee defendants acting as such, and the Engineering

Defendants, are liable from the damages which are the natural consequences of not timely paying

the General Contractor, and failing to properly monitor the performance of the Work, and failing

to identify and report defective construction which must be corrected, and failing to require

correction of same,  caused significant delays in funding the Project.

### THE BANKS EMBARK ON A TWO-PART SCHEME TO TAKE CONTROL OF THE PROJECT, CHANGE MANAGEMENT, AND DIVEST PLAINTIFFS OF OWNERSHIP OF THE 35th STREET PROPERTY

*-- PART ONE --*

*The Coerced Forbearance Agreement And The Banks' Economic Duress To Obtain A Deed In Lieu*

255.    Owner Plaintiffs assert, on information and belief, that shortly after

Milestone failed to achieve Substantial Completion and deliver a Temporary Certificate of

Occupancy for the Project by the Extended Substantial Completion Date of January 19, 2022, the

Banks hatched a plan to change the management of the Project, and turn over that Project to

someone the Banks determined could complete that Project and get the Banks paid on its loans.

256.    Owner Plaintiffs assert, on information and belief, that during the Q1 of

2022, the Banks employees, defendants Chan, Lau, Wu, and Tian, began searching for a "friendly" customer of the Banks, with significant real estate investing and development experience, with whom they could better "work with", and who they believed could complete the Project, pay off the outstanding debt, and hopefully make a profit (referred to herein as the "***Management Substitution Plan***".)

257.    The Management Substitution Plan had two parts – the first part required the Banks to obtain the leverage necessary to declare a default – a default that could not be challenged, and which could not be cured – and through which they could gain complete control of the title to the Project and Property, without have to go through a lengthy, costly and potentially challenging foreclosure action.

258.    Once the Banks would have unfettered control over the title to the Project, they would need to find a willing party to put up additional capital to finish the Project, have the skill set and resources to complete construction, and pay the Banks back the more than $68 million it was owed.

259.    To accomplish this scheme, the Banks, together with defendants Chan, Lau, Wu, and Tian, would first coerce Owner Plaintiffs to sign an incredibly one-sided, non-negotiable Forbearance Agreement, giving the Banks the right to effectively declare an default at will, and upon such a default to file a "Deed in Lieu of Foreclosure", which the Owner Plaintiffs would be required to deliver when signing the Forbearance Agreement.

260.    On or about April 27, 2022, by use of threats, coercion and economic duress, the Banks wrongfully forced Owner Plaintiffs into signing an incredibly one-sided, non-negotiable (and non-negotiated) Forbearance Agreement for the primary purpose of wrongfully obtaining a deed in lieu of foreclosure, so that the Banks could simply "take" the Property without

any due process or legal proceedings. A copy of the Forbearance Agreement is attached hereto as Exhibit "H".

261.    By this time Plaintiffs had already invested the vast majority of the Chen Family's wealth into the Project, had exhausted almost all of their liquid resources.

262.    As a result of the combined breaches by the Banks of the Building Loan Agreements as herein described, and the fact that in violation of the GMP Contract, Milestone was constantly issuing Fraudulent Change Orders (a total of 165 of them, during the period where just 14 Requests for Advances were made for the Project – or an average of a 12 Fraudulent Change Orders per Request for Advance), and due to the Bank's further breaches of the Loan Agreement, by refusing to fund any of the 165 Fraudulent Change Orders as Qualified Building Loan Costs out of available Building Loan proceeds, wrongfully requiring that the Owner Plaintiffs pay for such Fraudulent Change Orders out of other funds (which they did not have) before the Banks would fund any of the Requests for Advance, and the resultant delays by the contractor, put the Owner Plaintiffs' entire financial existence at risk.

263.    In April of 2022, the Banks threatened the Owner Plaintiffs, that they would stop funding the Project (even though there remained considerable funds available in the Building Loans) and commence foreclosures on both the 35th Street Property and the Lafayette Street Property, unless the Owner Plaintiffs sign the Forbearance Agreement.

### *The Defendant Banks and the Individual Bank Employee defendants Defraud Plaintiffs  to Induce their Signing of the Forbearance Agreement*

264.    The Banks, through Chan, made material misrepresentations to Owner Plaintiffs about the nature of the Forbearance Agreement.

265.    In Order to wrongfully induce Plaintiffs to sign same, defendant Banks through Chan made material misrepresentations to Plaintiffs to induce them to sign the

Forbearance Agreement, including, without limitation, that the Forbearance Agreement was simply perfunctory, in that it was a mere "***procedural formality***" that they had to sign in Order for the Banks to continue funding the Loans.

266.    In addition, Banks through Wu and Chan made multiple phone calls to Plaintiffs advising that Owner Plaintiffs "***should not over-negotiate the Forbearance Agreement***", that "***the Banks are not flexible, and not willing to change any terms***" , and that "***any negotiations will cause Plaintiffs to incur a 'high attorney bill', and further delay the Loan***", and that "***further negotiations will put Plaintiffs in default on an expired loan***".

267.    The above referenced statements made by Chan and Wu (as well as on behalf of defendant Banks) as above set forth, were false and fraudulent, and knowingly and intentionally made by Chan and Wu (and on behalf of the Banks) knowing that said statements were false and made with intent to induce Owner Plaintiffs to rely thereon to their detriment, by signing the Forbearance Agreement, and that Owner Plaintiffs did rely on the statements.

268.    When the Plaintiffs questioned and showed concern about being asked to sign a deed in lieu of foreclosure, Banks through Chan made further material misrepresentations by fraudulently stating "we are a Bank, and ***we do not want to take your property***" which statement Chan knew was false and was made in order to induce Owner Plaintiffs to rely thereon to their detriment by signing the Forbearance Agreement.

269.    The statements made by Chan as above set forth were false and fraudulent, and were intentionally made by Chan (and on behalf of Banks) knowing that said statements were false and fraudulent, and made in order to induce Owner Plaintiffs to rely thereon to their detriment, and Owner Plaintiffs did rely thereon to their detriment.

### *The Defendant Banks "Never" Signed the Forbearance Agreement and Plaintiffs Hereby Withdraw Any Open Offer For The Banks To Do So*

65

270.    The Forbearance Agreement, which was issued and dated by the Banks on April 27, 2022, was also signed by some of the Plaintiffs on April 27, 2022.

271.    However, the signature of SCB, on behalf of itself and as Administrative Agent for SCSB, which was notarized and signed by and through Chan and Wu, were dated April 22, 2022 – ***Five (5) days <u>before</u> the April 27, 2022 Agreement*** ever came into existence.

272.    The Banks' signature on April 22, 2022, cannot constitute the Banks' assent to an agreement which did not exist on April 22, 2022, as the Forbearance Agreement did not exist until five (5) days later.

273.    Because Banks never signed the April 27, 2022 Forbearance Agreement, the Banks have never accepted, nor made fully executory, the April 27, 2022 Forbearance Agreement, and as such, until immediately prior to the filing of this Adversary Proceeding, the draft of the Forbearance Agreement signed by Plaintiffs on April 27, 2022, remained open for acceptance until withdrawn (assuming that a party could somehow make effective an agreement, which by its terms, was to terminate prior to being executed by a party thereto).

274.    Owner Plaintiffs hereby formally withdraw their open offer, making it now impossible for the Banks to sign and make same fully executory, and Owner Plaintiffs hereby demand the immediate return of all original documents signed by them in connection with the unsigned (and now formally rejected) Forbearance Agreement, including without limitation, the Forbearance Agreement, the Deed in Lieu of foreclosure and related ACRIS documents, the Bill of Sale in Lieu, the Assignment of Contracts in Lieu, and the Assignment of General Intangibles in Lieu, each of which, and all Plaintiffs signatures thereon, are hereby withdrawn and rejected by Plaintiffs.

***The Outrageous Terms of the Incredibly Unfair,***

### *One-Sided, Unsigned Forbearance Agreement*

275.    In conjunction with the Forbearance Agreement, the Banks required that Owner Plaintiffs also sign a Deed in Lieu of foreclosure and related ACRIS documents running an additional 30 pages; as well as dozens more pages consisting of (i) a Bill of Sale in Lieu, (ii) an Assignment of Contracts in Lieu,  and (iii) an Assignment of General Intangibles in Lieu.

276.    Owner Plaintiffs were not given sufficient time to review and understand the terms of the Forbearance Agreement, had no ability to make changes or modifications, and effectively were forced to sign it.

277.    The Forbearance Agreement states at Paragraph I thereof:

> "*The Borrower Parties contemplate that they may be able to cure the Existing Event of Default, and repay the Loan in its entirety by the expiration of the Forbearance Period (defined below),* all as more specifically set forth herein." (Emphasis Added).

278.    Paragraph J of the Forbearance Agreement provides:

> "*The Borrower Parties have requested that Lenders temporarily forbear from certain of their rights under the Loan Documents, and continue funding disbursements under the Loans subject to and in accordance with the terms of the Loan Documents, until the end of the Forbearance Period to provide the Borrower Parties with sufficient time to effectuate strategies intended to enable the Borrower Parties to pay in full to Lenders certain of the amounts owing* (and to become owing) under the Loan Documents." (Emphasis Added).

279.    Prior to the signing of the Forbearance Agreement, the Loans were not accelerated.

280.    Section 2 of the Forbearance Agreement provides: "*Lenders hereby accelerate the Loan and declare same due and payable in full,* and each of the Borrower Parties hereby acknowledges the Existing Event of Default and waives any right to dispute or challenge Lenders' or Agent's rights under the Loan Documents to, among other things, accelerate the Loan

and to declare same due and payable in full as set forth herein".

281.    The Owner Plaintiffs were not permitted to change or modify that provision, and notwithstanding years of complaints and claims that the Banks were not properly following the Loan Agreements, the Banks were able, through wrongful threats and coercion, to force the Owner Plaintiffs to sign the Forbearance Agreement.

282.    The Loans were initially made in 2017.

283.    During the almost five (5) years since the Loans were made and the date of the Forbearance Agreement, Owner Plaintiffs have been unable to complete the Project and repay the Loans to the Banks.

284.    Now with this Forbearance Agreement, the Banks granted the Plaintiffs "*until the end of the Forbearance Period to provide the Borrower Parties with sufficient time to effectuate strategies intended to enable the Borrower Parties to pay in full to Lenders certain of the amounts owing* (and to become owing) under the Loan Documents".

285.    "Sufficient time" was not defined except in the context of the Forbearance Period.

286.    Section 2(b) of the Forbearance Agreement defines the "*Forbearance Period" as "commencing on the date hereof [April 27, 2022] and extending through and including the earliest to occur of (i) April 30, 2022* (the "Extension Date") (as such date may be extended pursuant to Section 4(c)(xi) below) or (ii) any Forbearance Default (such earlier date, the "Forbearance Termination Date").

287.    The "*sufficient*" period which the Banks agreed to give Owner Plaintiffs to come up with more than $70,000,000.00, before they simply take the title to the Property is *THREE (3) CALENDAR DAYS* – from April 27, 2022 through and including April 30, 2022.

68

288.    However, since April 27, 2022 was a Wednesday – the "sufficient" period which the Banks agreed to give Owner Plaintiffs to come up with more than $70,000,000.00 before they simply take the title to the Property is actually two (2) business days, as April 30, 2022 was a Saturday.

289.    If the Owner Plaintiffs do not pay off the Loan within the two (2) Business days granted them as the Forbearance Period, the Banks remedies are defined in Section 3 (b) as:

> "Upon the expiration or termination of the Forbearance Period without Borrower having repaid the Loan in full, Agent and each Lender shall be entitled at such time and at any time thereafter in its sole and absolute discretion to enforce all of its rights, remedies, powers and privileges under the Loan Documents (and/or at law or in equity) against any entity or other person, including, without limitation, the Borrower Parties, for the full payment of the Loan and the realization of the security interests in and liens on the Property, and any other collateral granted in connection with the Loan to the same extent as if Agent and Lenders had not agreed to forbear from doing so during the Forbearance Period. The fact of Agent's and Lenders' forbearance during the Forbearance Period is not, and shall not be construed as, a waiver of any of Agent's or Lenders' rights, remedies, powers or privileges, nor shall it be the basis to deem Agent or any Lender estopped from taking any action at a later date. All statutes of limitation, and all defenses of laches or waiver as to any default existing on the Effective Date or arising during the Forbearance Period, will be tolled and otherwise suspended during the Forbearance Period, and each time period provided in each such statute of limitations shall be extended by a period of time equal to the duration of the Forbearance Period.
>
> Deed in Lieu Documents. To facilitate the rights of Agent and Lenders after the Forbearance Period, the Borrower Parties hereby agree that, upon the expiration or early termination of the Forbearance Period without the simultaneous repayment in full of the Loan, ***Borrower shall immediately deliver (or shall immediately cause the delivery of) possession of the Property to Agent, Lenders or their designee(s), free and clear of all liens and encumbrances whatsoever except for liens and encumbrances expressly permitted under the Loan Documents, and any other collateral granted in connection with the Loan to Agent, Lenders or their designee(s), and the Deed in Lieu Documents shall, upon Agent's direction at such time or any time thereafter, be automatically and unconditionally released from escrow to Agent or its designee(s).***
>
> From and after the expiration or termination of the Forbearance Period, Agent shall have the right to file and/or record with the appropriate governmental authorities the Deed In Lieu Documents and exercise Agent's and Lenders' rights

hereunder and thereunder against the Property. Subject to applicable law, Borrower hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding any claim, the unenforceability or lack of validity of any of the Deed In Lieu Documents, or Agent's or any Lender's exercise of its rights and remedies hereunder and thereunder in accordance with the express provisions hereof and thereof. If the Deed In Lieu Documents are released to Agent in accordance with this Agreement, Agent shall have the right to fill in the name of itself, any Lender, or its designee(s) as the grantee under the Deed In Lieu Documents and/or any dates and other factual information (which, absent manifest error shall be deemed to be correct and accurate) required under the Deed in Lieu Documents, including, without limitation, the legal description of the Property. If Agent elects to file and/or record the Deed In Lieu Documents, Borrower and each other applicable Borrower Party covenant that they shall take all action reasonably requested by Agent or any Lender in connection with such recordation, including, without limitation, to deliver any other documents or instruments that Agent or any Lender reasonably believes are necessary to transfer the Property to Agent, any Lender and/or their designee. (Emphasis added)

290. In addition to the foregoing, at the end of the THREE (3) DAY FORBEARANCE PERIOD, in addition to the foregoing, the Forbearance Agreement requires Owner Plaintiffs to make additional deliveries to the Banks as, pursuant to Section 3(d), as follows:

"Other Deliveries. Upon the release of the Deed in Lieu Documents to Agent, the Borrower Parties shall be obligated to cause the following to be delivered to Agent or its designee:

(i) To the extent same are in the possession of any Borrower Party or any Affiliate thereof, originals of all building permits, certificates of occupancy, licenses, inspection certificates and/or other governmental approvals issued by any governmental authority relating to the Property or any portion thereof.

(ii) An affidavit, duly executed and acknowledged by Borrower, as required by Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), to the effect that the withholding of tax is not required under Section 1445 of the Code.

(iii) To the extent in the possession or control of Borrower or its affiliates, all keys, security cards, access cards and other entry devices with respect to the Property.

(iv)    To the extent in the possession or control of Borrower or its affiliates, all books and records related to the Property (other than such books and records, correspondence, and other documents that are confidential, proprietary or privileged).

(v)    All affidavits and/or indemnities that the Title Company may require to deliver anti-merger endorsements to Lender's Title Insurance Policy as required by Agent in connection with this Agreement and any owner's policy of title insurance to be obtained by Agent in connection with any transfer of the Property pursuant to the Deed in Lieu Documents.

(vi)    All other deliveries expressly required to be made by, or on behalf of, any of the Borrower Parties pursuant to the terms of this Agreement.

(vii)   Such other documents, instruments and agreements as may be reasonably necessary in Order to consummate the transactions contemplated by the Deed in Lieu Documents and/or this Agreement in accordance herewith.

291.    Should the Owner Plaintiffs comply with the foregoing, making an "absolute transfer … assignment and conveyance of all of Borrower's right, title and interest in and to the Property in fact as well as in form and is not now and shall not be intended as a mortgage, trust  conveyance, deed of trust or security instrument of any kind; that the consideration for such conveyance is exactly as recited herein and Borrower shall have, from and after the release of the Deed in Lieu Documents as provided for herein, no further interest, including right of redemption or claims, in and to the Property (or any portion thereof) or to the proceeds and profits which may be derived therefrom of any kind whatsoever", the Owner Plaintiffs are still liable to the Banks pursuant to Section 3 (f) titled "**Guarantors' Continuing Obligations",** which provides:

Notwithstanding delivery by the Borrower to, and acceptance by Agent of the Deed in Lieu Documents, if at any time it shall be deemed or determined by a court of competent jurisdiction or by any governmental authority that (1) the Deed in Lieu Documents failed to grant to Agent, Lenders, or their designee, as the case may be, fee simple title in and to the Property in accordance with this Agreement, or (2) such title is otherwise rescinded, withdrawn, overturned,

retracted, made null and void, set aside, cancelled, nullified or otherwise invalidated, or must be otherwise restored or returned to Borrower upon the insolvency, Bankruptcy or reorganization of any Borrower Party or any constituent Person thereof, or otherwise, then (x) the Guaranty (and Guarantors' obligations thereunder) shall remain in full effect notwithstanding any reduction to Guarantor's obligations thereunder that could have occurred as a result of transfer of fee simple title to the Property to Lender or its designee, and (y) if requested by Agent, any Lender or their designee, Borrower shall be unconditionally, absolutely, irrevocably, directly and personally obligated to convey, or cause the conveyance of, fee simple title in and to the Property to Agent, any Lender, or their designee in the manner required under his Agreement pursuant to the Deed in Lieu Documents. Notwithstanding the foregoing, nothing contained herein shall be deemed or construed as in any manner impairing, abridging or rescinding the Deed in Lieu Documents, this Agreement, or any of the transfers and conveyances set forth therein or herein.

292.    As of April 27, 2022, Owner Plaintiffs had invested the vast majority of the Chen Family's wealth into the Project, had exhausted almost all of their liquid resources, and the Banks would not permit them to draw any of said amounts from the Building Loans' availability, and Owner Plaintiffs were facing maturing loans, had no ability to substitute the contractor, and were facing financial disaster if the Banks took the actions they were then threatening – to stop funding the Loans and foreclose on both the Property and the Lafayette Street Property, pursue deficiency judgments against the Purported Guarantors, and put the Chen Family at risk of losing their homes, and the only remaining operating business, their art gallery.

293.    As such, Owner Plaintiffs were compelled, as a result of the wrongful threats and coercion by the Banks and through the individual Bank's employees, precluding Owner Plaintiffs from exercising their free will and independent business judgment, and forcing them to sign the unconscionable, one-sided Forbearance Agreement – which is in reality a contract of adhesion.

294.    Owner Plaintiffs signed the Forbearance Agreement because of the Banks' threats that they would stop funding the Building Loans if they did not sign the Forbearance

Agreement.

295.    In express violation of the Forbearance Agreement and the representations and threats made by the Banks, Wu, Chan, Lau and Tian, the Banks nonetheless did stop to fund the Building Loans after the Forbearance Agreement was signed by Owner Plaintiffs,

296.    The acts of Banks and the individual Banks Employees who orchestrated the unlawful scheme to wrongfully divest Plaintiffs of all they had if they refused to sign the Forbearance Agreement, which itself gave then nothing more than three (3) days until economic disaster and financial ruin arrived.


## —Part Two—

## THE BANKS WRONGFULLY TRY TO GET THE SCG DEFENDANTS TO TAKE OVER THE 35th STREET PROJECT

297.    Plaintiffs assert, on information and belief, that the Banks had decided that they would "change" the management team of the Project, by sourcing a "friendly" company to take over the management of, and eventually title to, the Project.

298.    Upon information and belief, to affect that goal, the Banks needed to identify a company which had both the ability to manage a large Manhattan construction project, as well as have the ability and desire to continue to capitalize such a project.

299.    Towards that end, upon information and belief, Owner Plaintiffs assert that the Banks turned to SCG America Group, an investment company that routinely invested in real estate projects, and which was affiliated with a large construction company, SCG America Construction.

300.    In order to induce SCG America Group and SCG America Construction to

73

become involved in the Project, the Banks needed to share the Owner Plaintiffs' confidential information with SCG America Group and SCG America Construction.

301.    In violation of their obligation as Banks to maintain the secrets and private information of their clients and customers strictly confidential, and upon information and belief, the Banks, without Owner Plaintiffs consent or approval, through defendants Wu, Chan, Lau and Tian, wrongfully disclosed Owner Plaintiffs confidential information to SCG America Group and SCG America Construction (collectively, the "***SCG Defendants***") without Plaintiffs' knowledge.

302.    Upon information and belief, the Banks breached their obligation to keep their customers' private information strictly confidential, and that the Banks' employees routinely fail to protect, and keep confidential, the Banks' customers data, loans, business arrangements and other private information.

303.    As recently as  January 4, 2024, as a result of SCSB's wrongful disclosure of customer data, the Financial Supervisory Commission of the Taiwanese Banking Bureau reported that it had taken "Major Enforcement Actions against defendant SCSB, for SCSB's "failure to properly establish and sufficiently implement internal controls to ensure customer data confidentiality and information security", and imposed a fine of NT $10,000,000.00 against defendant SCSB "in accordance with article 129, subparagraph 7 of the Banking Act".

304.    As a result of the Banks' wrongful disclosure of Owner Plaintiffs' confidential information to the SCG Defendants, the Banks wrongfully procured the interest of the SCG Defendants to take over the Project, to the detriment of Owner Plaintiffs.

305.    On information and belief that the Banks and the SCG Defendants came up with a scheme, whereby the Banks would introduce SCG America Group to the Owner Plaintiffs as a prospective mezzanine lender, willing to consider making a  "mezzanine loan" secured by the

Principals' equity in the Owner Plaintiffs, to help cover the growing cost of the Project—which, was rapidly increasing as a result of the wrongful actions of Milestone, the Banks, the individual Bank's employees and the Engineering Defendants as above described.

306.    Because a mezzanine loan typically takes the equity holders' ownership interests in a company as its collateral, should there be a default and the mezzanine lender "foreclose", the mezzanine lender could end up with 100% of the ownership interests in the Owner Plaintiffs.

307.    While a mortgage foreclosure in New York can take upwards of five (5) years given the courts' back-log, because the ownership interests pledged to secure a mezzanine loan  are treated as a "chattel mortgage" covered by the Uniform Commercial Code ("*UCC*") and secured through a UCC filing, all a mezzanine lender needs to do to foreclose is declare a default and issue a written notice setting a date and time for the sale of the collateral, which may be sold in a "private sale" (usually at the mezzanine lender's office) with the highest bidder showing up at such sale becoming the owner of 100% of the equity interests in the mezzanine borrower, which is why a mezzanine loan is sometimes referred to in the real estate and banking industries as a "loan to own".

308.    Owner Plaintiffs assert that all the Defendants conspired to structure a very expensive mezzanine loan, specifically designed to quickly put the mezzanine borrowers (and in this case the Purported Guarantors) in default.

309.    In addition to "lending" the additional capital to pay the increasing costs of construction, the plan was to require the Owner Plaintiffs, as the mezzanine borrowers, to retain, SCG America Construction as the "Construction Manager" for the Project, at the Plaintiffs' cost, paying them outrageous construction management fees – thereby further lining the SCG

Defendants pockets, further dissipating Owner Plaintiffs' remaining cash, and hastening the time of a likely default.

310.    As part of the plan, the mezzanine loan would require guaranties from the Purported Guarantors, in order to similarly tie-up, and put at risk, the individual assets of the non-borrower guarantors under the Banks' loans.

311.    Owner Plaintiffs assert, that the Banks and the SCG Defendants' plan was to immediately get SCG America Construction to take over as the construction manager of the Project, close the mezzanine loan with the Owner Plaintiffs and Purported Guarantors, and while SCG Defendants use the first few months to learn everything about the Building and the Project, the Owner Plaintiffs, as mezzanine borrowers would likely default, and the SCG Defendants could then orchestrate a UCC sale.

312.    Owner Plaintiffs assert, on information and belief, that the Banks and the SCG Defendants planned to declare a default as soon as one occurred, accelerate the mezzanine note, give Owner Plaintiffs written notice, and then simply foreclose on 100% of the Plaintiffs' ownership interests in the Owner Plaintiffs and thereby take complete control of the Project.

313.    Owner Plaintiffs further assert that the scheming defendants did not stop there. If SCG America Group were to obtain 100% of the ownership interests in the Project, it would still be subject to the Banks' mortgages.

314.    The Banks and the SCG Defendants could then elect from several options, including, to either (i) take the deed in lieu and sell the asset to SCG America Group; or (ii) sell the mortgage to SCG America Group, who would foreclose and if there were a deficiency (which, given the facts of this case, seems quite likely), the SCG America Group could proceed to enforce the guarantees against the Purported Guarantors; or (iii) alternatively, the Banks could undertake

the foreclosure, with SCG America Group winning the bid, and the Banks could then pursue enforcement of any deficiency against the Purported Guarantors. Either way, Owner Plaintiffs lose, and the Banks and their co-conspirators, the SCG Defendants, win – all at Owner Plaintiffs' expense.

315.    Either way, the Banks would still have a mortgage on the Chen Foundation's Lafayette Street Property, – all of the proceeds of which were "required" by the Banks to be invested in the Project – which, if foreclosed, would likely result in the Chen Foundation losing its property, and the remaining Plaintiffs losing their homes and their art gallery business.

316.    In furtherance of the scheme, on or about July 27, 2023, defendant Tian, on behalf of the Banks, introduced the SCG Defendants to Plaintiffs, and scheduled a tour of the Project, and raised the prospect of a possible mezzanine loan.

317.    At the Bank's insistence, the tour is attended by representatives of the SCG Defendants, the Banks and the Owner Plaintiffs.

318.    The Banks, through defendants Wu, Chan, Lau and Tian made it very clear to Owner Plaintiffs that doing a deal with the SCG Defendants was Owner Plaintiffs' "***last bet – and [they] needed to do everything in their power to make the deal with SCG***", otherwise, the Banks, through defendants Wu, Chan, Lau and Tian threatened Owner Plaintiffs that "***the Banks would have no choice but to do things the 'hard way' – and file the Deed in Lieu***".

319.    Later that day, on July 27, 2023, defendant Tian wrote to the SCG Defendants by email to thank them, stating: "***SCG Team***, thanks again for ***touring the project this morning with us***. I've included everyone in this email, ***and please let us know what you may need for the project assessments.*** Thanks".

77

320.     Later that same day, Hank Lee, the Vice President of SCG America Group,

puts an information request together by email, stating:

"see below the preliminary request information list from construction department

only:

> 1.  Design Specifications, DOB approved drawings and up-to-date
> construction drawings
> 2. Contracts, including but not limited to (1) GC contract, (2)
> procurement contracts, (3) Separate Contractor contracts, (4) A/E
> &consultants design and service agreements.
> 3. the most recent AIA 703 payment application form and all  supporting
> documents including all subs' Schedule of Values
> 4. GC to disclose its payment status to its subs, installers and
> suppliers, including lien waiver letters
> 5. Material and equipment and fixtures, and their warranty info:
> (1) List and quantity of stored materials, equipment, fixtures on
> job-site, and off-jobsite.
> (2)List and quantity of materials, equipment, fixtures Orderd by not
> delivered, and delivery schedule
> (3) list and quantify of materials, equipment, fixtures not Orderd
> yet, with information of anticipated leadtime
> 6. Status of Inspections, tastings, sign-offs
> 7. Current General Schedule
> 8. GL, builder's risk policies and expiration date
> 9. Bond? or SDI policies? (if any)

321.     Later that day defendant Wu wrote back to Mr. Lee stating:

Dear Hank,

Thank you for the prompt action of you and your team.
Borrower promised to provide the information to all of us tomorrow.

 We shall continue to coordinate and follow up.

Best regards,
C N Wu

322.     The SCG America Group and the Banks were wrongfully having

discussions without Owner Plaintiffs or any of their representatives being present, or of which they

were aware.

78

323.    On August 1, 2023, defendant Tian, took control, setting another meeting

between SCG America Group and Owner Plaintiffs, and determining who should attend, writing:

> SCG team has requested for another meeting with Borrower and Lender for the potential mezz loan ask.
>
> Please let me know if this Thursday morning, 10:00am works? We will need to be in their Time Square office.
>
> Thanks

324.    On August 4, 2023, another tour of the Project was scheduled, and the

Banks made clear that it intended one of its representatives be there, writing:

> Hi Douglas, Hank and Janet
>
> I would like CN Wu to also join the visit on Monday at 9:30 am as he is also familiar with the project representing the Banks.
>
> Thanks
> Timothy Chan

325.    On September 6, 2023, Janet Chong wrote to defendants Wu, Chan, Lau

and Tian to update them on discussions Owner Plaintiffs had with SCG America Group to address

increasing the amount of the mezzanine loan to cover the costs needed to complete the Project,

stating:

> Hi all,
>
> I spoke to Jenny yesterday, she said she will talk to her boss regarding the loan size to be higher than $12mill as we have to make sure the amount is enough to get the project to completion.
>
> She is studying the monthly statement I sent her and she will be in touch after she speaks to her boss this week.
>
> Thanks,
>
> Janet

326.    Apparently, the fact that Owner Plaintiffs had discussions with the SCG America Group, without the Banks' involvement (which is how a typical mezzanine loan would be structured and negotiated) upset Banks, and on September 6, 2023, defendant Tian made clear in an email to Plaintiffs, that the Banks intend to be involved in every aspect of the transaction with SCG America Group and SCG America Construction, and prohibited Owner Plaintiffs to have any discussions or negotiations with SCG America Group without them, which, Plaintiffs believe was motivated by the Banks desire to manipulate the structure and terms of that transaction, stating:

> Janet –
>
> in order to avoid any mis-communication, please have CN (or anyone else we assign in CN's absence from the bank's side) for future discussions (in person or calls) you have with SCG team. ?Thanks for your understanding.
>
> Sent with BlackBerry Work
> (www.blackberry.com)

327.    On or about August 29, 2023, defendants SCG America Group issued its term sheet for a mezzanine loan to the Owner Plaintiffs.  A copy of same is attached hereto as Exhibit "I"

328.    On or about August 29, 2023 defendants SCG America Construction issued its Construction Management Agreement to the Owner Plaintiffs.  A copy of same is attached hereto as Exhibit "J".

329.    The Banks and defendants Wu, Lau, Chan and Tian not only sourced and brought the SCG Defendants to Owner Plaintiffs, they took control of the proposed mezzanine loan, by doing the things that an owner generally does, and that generally banks do not (and should not) – the Banks took control of the transaction, created the financial models (based on Owner Plaintiffs' proprietary confidential information), which they wrongfully shared with the SCG

Defendants for the proposed mezzanine loan transaction, and they "structured" the the terms of the

mezzanine loan, determining who needed to pay what to whom, and for how much, and otherwise

acted so far out of the boundaries that a reasonable lender should not cross in the ordinary course.

330.    Towards that end, on October 12, 2023, defendant Wu individually, and as

the Administrative Agent of the Banks wrote an email to the SCG Defendants and the Owner

Plaintiffs stating:

> Dear all,
>
> Attached please find worksheets on our projected sources and uses of additional funds required to complete the Project.
>
> The worksheets were prepared based on information available to us and our best estimation, and are provided for discussion purpose only.
>
> Password will be provided in next email.
>
> (See attached file: Budget & Sourse-Use of Funds - New 09.28.2023-share-.xlsx)
>
> Please feel free to call us if you have any question.
>
> Best regards,
>
> C N Wu
> Vice President & Senior Relationship Manager
> Relationship Management New York Branch
> Shanghai Commercial Banks Limited

331.    On October 17, 2023, Jenny Chen on behalf of the SCG Defendants wrote

back, stating:

> Dear Mr. Wu,
>
> Thank you for your projection.
>
> Upon reviewing the worksheet, we noticed that the reserved amount for the CM Management fee is insufficient. As per the CM Management agreement, the owner is required to pay a monthly fee of $50,000 for the first 9 + nine months, and $30,000 per month thereafter. Based on the

projection period of 15 months, the total CM fee should be $630,000 ($50,000 x $30,000 x 6).

We may need to further discuss the allocation of the remaining Mezz loan balance between Owner Supplied Materials and Change Orders with the owner.

Thank you for your attention to this matter.

Best Regards,
Jenny

332.   Later the same day, defendant Wu responded:

Dear Jenny,

Understood. We understand that the ultimate numbers will be subject to further discussion.

Preliminarily using the budget under discussion, with the 4 months of CM Management fee added back to cover the entire 15-month period, the amount of US $1.72 million originally estimated remaining Mezz loan proceeds that can be allocated to pay change Orders and owner supply items would be reduced by US $120K to US $1.6 million, while the project cost to be funded by Owner would go up by US $120K from $1.97 million to US $2.09 million.

Best regards,

CN Wu
Vice President & Senior Relationship Manager
New York Branch Shanghai Commercial Banks Limited

333.   Clearly, the Banks and the SCG Defendants were scheming to structure the mezzanine loan with ever increasing fees payable to the SCG Defendants, and with the expectation that Owner Plaintiffs would be required to cover the costs of Fraudulent Change Orders out of funds other than the Building Loans.

334.   Indeed, on September 12, 2023, defendant Tian, took the incredible step of negotiating on behalf of SCG America Group, and against the interests of its Owner Plaintiffs' customers by in an email, setting forth the terms Owner Plaintiffs must meet in order to obtain the

SCG America Group's mezzanine loan, as follows:

> Janet, Ted
>
> Thank you.
>
> Please let us know how Borrower & ownership will address the remaining equity shortfall considering the pending mezz investment (on a net basis, excluding SCG fees & interests), to balance the budget for completion first.
>
> You probably need to work with CN on a final budget, then we can determine the remaining equity shortfall, and Borrower's committed timeline, before we can meet with SCG team again.
>
> We do not believe SCG will be interested in upsizing their mezz investment at this moment.
>
> Thanks
> Jessie

335.    As a result, the SCG Defendants re-traded the proposed terms of the deal.

336.    On October 24, 2023, Jenny Chen, on behalf of the SCG Defendants wrote to Mr. Wu, and the Owner Plaintiffs' representative, Janet Chong, stating:

> Dear Mr. Wu,
>
> I appreciate the explanation you provided.
>
> Thank you.
>
> Dear Ms. Chong,
>
> I would like to revise the Mezz Loan Term Sheet based on the Projected Sources and Uses of Funds of the Project[9].
>
> However, I would appreciate it if you could demonstrate the source of the remaining balance of $2.09 million in owner equity to balance the budget before we proceed with the mezz loan consideration.
>
> Thank you,
> Jenny

---

[9] Which the Banks prepared and provided to the SCG Defendants.

337.    On October 30, 2023, defendant Wu wrote to Owner Plaintiffs informing

them of a private discussion between the Banks and the SCG Defendants (of which Plaintiffs were

never made aware) advising:

> Dear all,
>
> We were just informed by SCG team that they would no longer be involved
> with the weekly construction meetings on this project going forward.
>
> In the meantime, we consider that we need a formal meeting with the owners
> in our office the next day or two.
>
> Please let us know your time preference.
>
> Nothing herein is a commitment or an admission or waiver of any of our
> rights and remedies under the loan documents and forbearance agreement in
> connection with our matured loans and expired facilities to Neo Image
> Enterprises, LLC and New Tent, LLC. All rights and remedies reserved
>
> Regards,
>
> C N Wu
> Vice President & Senior Relationship Manager
> Relationship Management
> New York Branch
> Shanghai Commercial Bank Limited

338.    Later that day, Janet Chong, on behalf of Owner Plaintiffs, responded,

writing:

> Hi CN,
>
> I only get this message from you and I didn't hear from SCG regarding
> this.
>
> Maybe they are waiting for SCG to be officially on board as CM after SCG
> mezz loan closed.
>
> I am trying to get in touch with SCG and find out more info to give you an
> updates.
>
> We could meet on Wed after our regular OAC meeting and come to SCB

at 12pm.

Thanks,
Janet

339.    By November of 2023, it became obvious that the SCG Defendants were expecting the Owner Plaintiffs to fund even more Fraudulent Change Orders out of their own funds, and that the Owner Plaintiffs could never survive the terms of the proposed mezzanine loan.

340.    Although the mezzanine loan transaction did not close, the SCG Defendants, with the full knowledge and consent of the Banks, wrongfully and fraudulently claimed that while SCG America Group was underwriting the proposed mezzanine loan, instead of doing due diligence in the ordinary course of underwriting a potential mezzanine loan, SCG America Construction was purportedly providing construction management services for the Project and thus entitled to charge Owner Plaintiffs for same.

341.    On December 19, 2023, SCG America Construction wrongfully issued an "invoice" for One Hundred Fifty Three Thousand Dollars ($153,000.00) to the Owner Plaintiffs for "construction management services" that SCG America Construction never provided, nor had Owner Plaintiffs retained SCG America Construction to provide such services (the "***SCG Fraudulent CM Invoice***"). A copy of the SCG Fraudulent CM Invoice is attached as Exhibit "K".

342.    Owner Plaintiffs rejected SCG Defendants offers, never signed the Construction Management Agreement, never authorized SCG America Construction to provide any services to Owner Plaintiffs and rejected the SCG Fraudulent CM Invoice.

343.    Notwithstanding the foregoing, both SCG America Construction, on its own behalf, and the Banks, on behalf of SCG America Construction, continued to demand payment of the SCG Fraudulent CM Invoice for months thereafter.

85

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Breach of Contract - Building Loan Agreements
### Against the Defendant Banks SCB and SCSB

344.    Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

345.    Owner Plaintiffs have performed all conditions required under the Building Loan Agreements and were not in default of same prior to the Banks' breaches as above set forth, and as more fully set forth below, and/or Owner Plaintiffs' performance thereof has been prevented by the acts and omissions of the Banks.

### Failure to Timely Fund Requests For Advances

346.    The Building Loan Agreements required, pursuant to Section 5.1 (e) thereof that "**each Request for Advance will be funded within <u>five (5) Business Days</u> of Administrative Agent's receipt of all required documents**".  (Emphasis Added).

347.    During the term of the Building Loan Agreements the Owner Plaintiffs submitted fourteen (14) Requests for Advances pursuant to the terms of said Building Loan Agreements.

348.    The 1st Request for Advance was submitted to the Banks with all required documents on or about 8/19/2020, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 8/26/2020 in accordance with Section 5.1 (e) of the Building Loan Agreements.

349.    The Banks did not fund the 1st Request for Advance until 9/4/2020.

350.    The Banks' failure to timely fund the 1st Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan

86

Agreements.

351.    The 2nd  Request for Advance was submitted to the Banks with all required documents on or about 4/7/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 4/14/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

352.    The Banks did not fund the 2nd Request for Advance until 4/15/2021.

353.    The Banks' failure to timely fund the 2nd Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

354.    The 3rd  Request for Advance was submitted to the Banks  with all required documents on or about 5/13/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 5/20/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

355.    The Banks did not fund the 3rd Request for Advance until 5/28/2021.

356.    The Banks' failure to timely fund the 3rd Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

357.    The 4th Request for Advance was submitted to the Banks  with all required documents on or about 6/18/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 6/25/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

358.    The Banks did not fund the 4th Request for Advance until 7/6/2021.

359.    The Banks' failure to timely fund the 4th Request for Advance pursuant to

the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

360.     The 5th  Request for Advance was submitted to the Banks  with all required documents on or about 7/7/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 7/14/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

361.     The Banks did not fund the 5th Request for Advance until 8/3/2021.

362.     The Banks' failure to timely fund the 5th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

363.     The 6th Request for Advance was submitted to the Banks  with all required documents on or about 8/13/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 8/20/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

364.     The Banks did not fund the 6th Request for Advance until 9/15/2021.

365.     The Banks' failure to timely fund the 6th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

366.     The 7th Request for Advance was submitted to the Banks  with all required documents on or about 11/16/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 11/23/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

367.     The Banks later confirmed the 7th Request for fund Advance is reduced to

zero.

368.    The Banks' failure to timely fund the 7th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

369.    The 8th Request for Advance was submitted to the Banks  with all required documents on or about 12/1/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 12/8/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

370.    The Banks did not fund the 8th Request for Advance until 2/7/2022.

371.    The Banks' failure to timely fund the 8th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

372.    The 9th Request for Advance was submitted to the Banks with all required documents on or about 12/7/2021, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 12/14/2021 in accordance with Section 5.1 (e) of the Building Loan Agreements.

373.    The Banks did not fund the 9th Request for Advance until 4/29/2022.

374.    The Banks' failure to timely fund the 9th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

375.    The 10th Request for Advance was submitted to the Banks with all required documents on or about 4/19/2022, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 4/26/2022 in accordance with Section 5.1 (e) of

the Building Loan Agreements.

376. The Banks did not fund the 10th Request for Advance until 4/29/2022.

377. The Banks' failure to timely fund the 10th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

378. The 11th Request for Advance was submitted to the Banks with all required documents on or about 6/21/2022, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 6/28/2022 in accordance with Section 5.1 (e) of the Building Loan Agreements.

379. The Banks did not fund the 11th Request for Advance until 7/7/2022 (1st disbursement) and 9/26/2022 (2nd disbursement). Moreover, the Banks withheld a portion of the 11th Request, causing Milestone to slow or stop Work on the Project, and make a big deal out of the fact they were not being paid, which threats, eventually got the Banks to release the wrongfully withheld portion of the 11th Request.

380. The Banks' failure to timely fund the 11th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

381. The 12th Request for Advance was submitted to the Banks with all required documents on or about 8/1/2022, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 8/8/2022 in accordance with Section 5.1 (e) of the Building Loan Agreements.

382. The Banks did not fund the 12th Request for Advance until 8/16/2022.

383. The Banks' failure to timely fund the 12th Request for Advance pursuant to

the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

384.    The 13th Request for Advance was submitted to the Banks  with all required documents on or about 8/26/2022, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 9/2/2022 in accordance with Section 5.1 (e) of the Building Loan Agreements.

385.    The Banks did not fund the 13th Request for Advance until 9/26/2022.

386.    The Banks' failure to timely fund the 13th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

387.    The 14th Request for Advance was submitted to the Banks with all required documents on or about 12/19/2022, and pursuant to the Building Loan Agreement, the Banks were contractually required to fund same not later than 12/26/2022 in accordance with Section 5.1 (e) of the Building Loan Agreements.

388.    The Banks did not fund the 14th Request for Advance and Owner Plaintiffs funded it.

389.    The Banks' failure to timely fund the 14th Request for Advance pursuant to the Building Loan Agreements constitutes a breach by the Banks of the Building Loan Agreements.

390.    As a direct and proximate result of the Banks' above-described breaches of the Building Loan Agreements, Owner Plaintiffs have been damaged in that the Project was severely delayed – by more than two (2) years from the expected Substantial Completion Date as set forth in the GMP Contract, causing Owner Plaintiffs to incur more than Two (2) Years of

Interest on more than $68 Million Dollars.

391. With each breach by the Banks of failing to timely fund Requests for Advance under the Building Loans, the General Contractor slowed down the progress of the Work, or simply stopped working on the Project.

392. As a result of the fourteen (14) cycles of Milestone's starting and slowing, or starting and stopping the Work, as well as a result of Milestone's negligent construction and resulting construction defects, the Building was exposed to the elements for a lengthy period, resulting in massive water infiltration, resulting in significant growth of Black Mold and other molds, with the Building becoming a breeding ground for toxic spores and fungi, which has, and continues to spread, on, in and through materials that contain cellulose, including paper products, wood products, drywall, insulation, piping insulation and HVAC ductwork, and other building materials and finishes, resulting in toxicity in the walls, floors, ceilings and other components of the Building, all of which now requires removal, demolition and environmental clean-up, and thereafter a complete re-building of what has been built under the Contract over the past four (4) years, and which is now destroyed and effectively useless.

### *Failure to Reject Non-Conforming Fraudulent Change Orders*

393. The Project's Building Loan Agreements provide, at Section 4.6 titled "Contracts", that all General Contractor's Construction Contracts "are subject to the consents of Administrative Agent in its sole and absolute discretion, and subject to the review of the Independent Consultant with report provided to Administrative Agent".

394. As such, the Banks, through their Administrative Agent, defendant Wu, had the obligation to "consent" to the "form and substance" of the Milestone GMP Agreement as being satisfactory to the Banks' Administrative Agent in his sole discretion.

395.    Subsumed within the Banks' obligation to "consent" to the "form and substance" of the Milestone GMP Contract is the obligation to read and understand the terms of the Milestone GMP Contract and to be able to decide whether to consent to same.

396.    Upon information and belief, before consenting to the form and substance of the Milestone GMP Contract, the Banks' Administrative Agent had to have read and understood the terms of each contract.

397.    In this case, the Banks' Administrative Agent gave the Banks' consent to the "form and substance" of the Milestone GMP Contract.

398.    As such, the Banks' Administrative Agent either did, or must be deemed to have, (i) read the Milestone GMP Contract, and (ii) understood the "form and substance" of the Milestone GMP Contract.

399.    Section 7.1.2 of the Milestone GMP Contract's General Conditions unambiguously provides that a "Change Order shall be based upon agreement among the Owner, Contractor and Architect".

400.    Section 7.3.10 of the Milestone GMP Contract's General Conditions, makes clear that "[w]hen the Owner and Contractor agree *with a determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time*, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately *and the Architect will prepare a Change Order*". (Emphasis added).

401.    At no time during the term of the Milestone GMP Contract did the Architect prepare any Change Orders for the Project.

402.    At no time during the term of the Milestone GMP Contract did the Owner Plaintiffs seek or come to agreement with the Architect with respect to any of the 165 Fraudulent

Change Orders.

403.    Having read, understood and having consented to the Milestone GMP Contract, and upon information and belief the Banks, and their Administrative Agent, knew, or should have known, that a "Change Order" under the Milestone MP Contract (i) required the Owner Plaintiffs' agreement; (ii) required the Project Architect's agreement; and (iii) must be prepared by the Architect (not the Contractor); failing which it does not constitute a "Change Order" under the Milestone GMP Contract.

404.    Only after Milestone wrongfully and fraudulently threatened to breach the Milestone GMP Contract if Owner Plaintiffs did not sign 50 of the 165 non-conforming and Fraudulent Change Orders, were owner Plaintiffs forced to sign the voidable, non-conforming Fraudulent Change Orders, through coercion and economic duress, resulting in their assent being extracted when they had no free will in such assent,

405.    It was Milestone, with whom the Banks had continuous, on-going communications regarding the Requests for Advances for the Project, – not the Owner Plaintiffs – and it was Milestone that wrongfully sought the Bank's consent for such voidable, non-conforming Fraudulent Change Orders.

406.    By consenting to the Milestone's continuous demands for approval of said voidable, non-conforming Fraudulent Change Orders, which wrongfully increased the price beyond the GMP – the Banks breached their contractual obligation to read, understand and consent to the Milestone GMP Contract, and by virtue thereof, breached the Building Loan Agreements, and their common law duty to not dissipate the collateral pledged by the Guarantors.

407.    Moreover, Section 7.2 of the Building Loan Agreements **prohibit any changes or change Orders which "affect…construction . . . of the Project or any other change**

94

***Orders, without the prior written consent of [SCB as] Administrative Agent***". (Emphasis added).

408.    At no time did Owner Plaintiffs seek, nor obtain, the Banks' Administrative Agent's ***prior written consent*** to any of the voidable, non-conforming Fraudulent Change Orders.

409.    The Banks' Administrative Agent nonetheless, breached the Building Loan Agreements by wrongfully demanding that the Owner Plaintiffs pay – not from the Building Loan unused proceeds – but from other funds – 50 of the voidable, non-conforming Fraudulent Change Orders which Milestone demanded be paid or else it would wrongfully terminate the GMP Contract, or otherwise stop working or abandon the Project.

410.    The Banks' failure to reject the 50 the voidable, non-conforming Fraudulent Change Orders, (i) because they did not comply with the GMP Contract's definition of a Change Order; and (ii) because the Owner Plaintiffs did not seek nor obtain the Banks' Administrative Agent's prior written approval of any of the 50 voidable, non-conforming Fraudulent Change Orders, constituted multiple breaches by the Banks of  Section 4.6 of the Building Loan Agreements, to read and understand the terms of the Milestone GMP Contract in Order to decide whether to consent to same, and Section 7.2 of the Building Loan Agreements' prohibition of any changes or Change Orders which were not approved in writing PRIOR to being issued.

411.    As a direct and proximate result of the Banks' above described breaches of the Building Loan Agreements, Owner Plaintiffs have been damaged as above described, requiring removal, demolition and environmental clean-up, and thereafter a complete re-building of what has been built under the Contract over the past four (4) years, which is now in bad shape and effectively useless.

### *Demanding that Owner Plaintiffs Pay the Fraudulent Change Orders* <br> *Out of Funds Other Than the Unused Proceeds of the Building Loans*

412.    The Building Loan Agreements clearly set forth which costs qualify for

payment out of the loan proceeds in its definition of "***Building Loan Covered Costs***", which include "[t]he costs of the construction of the Improvements on the Property to the extent any of the same constitute a "***cost of improvement***" as such term is defined in the Lien Law of the State of New York.

413.    Each of the 50 voidable, non-conforming Fraudulent Change Orders which Milestone and the Banks wrongfully demanded that Owner Plaintiffs pay out of funds other than the available, un-used, Building Loan Proceeds, qualify as a "cost of improvement" as defined in the Lien Law of the State of New York, and as such are Building Loan Covered Costs.

414.    Section 2.1 of the Building Loan Agreements clearly provide that "from time to time the Lenders hereby agree to advance to the Borrower, and the Borrower hereby agrees to borrow from the Lenders, a total aggregate amount not to exceed the Maximum Loan Amount".

415.    Pursuant to Section 2.1 of the Building Loan Agreements, each of the Banks committed to, and agreed to advance out of the available Building Loan proceeds all Building Loan Covered Costs requested by Plaintiffs, and which were approved by the Banks' Independent Consultant up to "the Maximum Loan Amount".

416.    Pursuant to section 5.1 (c) of the Building Loan Agreements, "[t]he Independent Consultant shall screen each Request for Advance. The Independent Consultant's approval and endorsement recommendation for honoring of each Request for Advance with report in form and substance satisfactory to Administrative Agent in its sole and reasonable discretion is a pre-condition of funding any advance of the Loan. The advance amount will be based on the report of the Independent Consultant".

417.    The Independent Consultant approved and provided the Engineering Defendants' endorsement recommending honoring all fifty (50) voidable, non-conforming,

Fraudulent Change Orders.

418. Because each of the 50 voidable, non-conforming, Fraudulent Change Orders approved by the Banks' Independent Consultant, and because each of the 50 voidable, non-conforming, Fraudulent Change Orders qualified as a "***Building Loan Covered Cost***", and because at the time of submittal of each of the fourteen (14) Requests for Advance, the Owner Plaintiffs had not borrowed in the aggregate, the Maximum Loan Amount, there was sufficient monies available in the un-used proceeds of the Building Loans to advance same out of the Building Loans.

419. Notwithstanding the foregoing, the Banks failed and refused to comply with their contractual obligations to fund same from the un-used funds available to draw against under the Building Loans, and the Banks' multiple refusals to do so constitute at least fourteen (14) separate breaches of the Building Loan Agreements by the Banks.

420. Notwithstanding the Independent Consultant's negligent, reckless, or fraudulent approval and endorsement recommending the honoring of all fifty (50) voidable, non-conforming, Fraudulent Change Orders, the Banks, through their Administrative Agent, had the contractual obligation to review each of the Independent Consultant's approval and endorsement recommendations of each Request for Advance to determine, ***in the Banks' Administrative Agent's sole and reasonable discretion***, whether the Independent Consultant's approval and endorsement recommendations were "satisfactory", as a pre-condition of funding any advance of the Loan.

421. Had the Banks' Administrative Agent properly undertaken a review of the Independent Consultant's approval and endorsement recommendations to pay the 50 voidable, non-conforming, Fraudulent Change Orders, the Banks' Administrative Agent should not have

been satisfied with the Independent Consultant's negligent, reckless or fraudulent approval and recommendations to pay same.

422.   Therefore, the Banks' Administrative Agent, either failed to undertake such a review, or only did a cursory review, in either case, same constitutes additional breaches by the Banks of the Building Loan Agreements.

423.   As a direct and proximate result of the Banks' above described breaches of the Building Loan Agreements, Owner Plaintiffs have been damaged, to the extent of requiring the removal, the demolition and the environmental clean-up of the Building, and thereafter a complete re-building of what has been built under the Contract over the past four (4) years.

### *Failure of Banks to Replace Independent Consultant*
### *with a Competent, Qualified Independent Consultant*

424.   Having been frustrated by the Engineering Defendants unreasonable, and wrongful reporting and approval of Requests for Advances, on December 28, 2022, Janet Chong, on behalf of the Owner Plaintiffs wrote to defendants Tian, Chan and Wu, complaining about the Banks' on-going failures to timely fund Requests for Advances, and requested the Banks to replace the Engineering Defendants, who were creating issues outside the four corners of the Milestone GMP Contract and the Plaintiffs' Building Loan Agreements with Banks, as follows:

Hi Jesse & Timothy & CN,

I hope you all had a great holiday with your family.

I have brought this up earlier at our meeting that we would need SCB to release approved bank fund req 14 to keep GC working . . .

GC expressed complaints to us that partners bank engineer representative Julie who has been very conservative on approving fund for work done caused part of the progress delay, so that explains why GC doesn't want to push for progress because if they do more work and they only get 50% fund reimbursed, they can't take this stretch in floating the job and put stress in their cash flow.

98

So we request a change of representative within partners and restart the job with a pair of new fresh eyes in 2023. Pls kindly arrange.

I am available for a discussion whenever you are.

Best,

 Janet

425.    Had the Banks' Administrative Agent properly undertaken a review of the Independent Consultant's approval and endorsement recommendations to pay the 50 voidable, non-conforming, Fraudulent Change Orders, the Banks' Administrative Agent should not, reasonably have been satisfied with the Independent Consultant's negligent, reckless or fraudulent approval and recommendations to pay same. The Banks' Administrative Agent was duty bound to replace the Engineering Defendants with a competent independent consultant, capable of understanding the terms of both the Milestone GMP Contract and the Building Loan Agreements, and understanding when monitoring the progress of the Work that the General Contractor is failing to conform the Work to the Contract Documents and the Plans and Specifications.

426.    The Banks' Administrative Agent was not competent and similarly was not capable of understanding the terms of both the Milestone GMP Contract and the Building Loan Agreements, nor understanding when monitoring the progress of the Work that the general contractor is failing to conform the Work to the Contract Documents and the Plans and Specifications.

427.    Defendant Wu, and any other of the Banks employees who were tasked with Administrative Agent responsibilities over the Loans were incompetent, and therefore failed to realize the incompetence of the Engineering Defendants even though the Banks' Administrative Agent periodically visited the Project to monitor the progress of construction and the Loans.

428.    The Banks' Administrative Agent breached his, and the Banks' duty to

Owner Plaintiffs to retain a competent Independent Consultant, and such breach constitutes a breach of the Building Loan Agreements by the Banks and defendant Wu.

429.    As a direct and proximate result of the Banks' and Wu's above described breaches of the Building Loan Agreements, Owner Plaintiffs have been damaged as above described, requiring removal, demolition and environmental clean-up, and thereafter a complete re-building of what has been built under the Contract over the past four (4) years.

*Permitting Milestone to Remain on the Project and Continue
Funding Payments to Milestone after Milestone Breached the
GMP Contract by Failing to Achieve Substantial Completion
by January 19, 2022, the Extended Substantial Completion Date*

430.    The Milestone GMP Contract initially required Milestone to achieve Substantial Completion by approximately by May 3, 2021.

431.    When it became clear that Milestone could not meet that schedule, and at the Banks' insistence, the time for Milestone to achieve Substantial Completion and deliver a Temporary Certificate of Occupancy was extended to January 19, 2022, the Extended Substantial Completion Date.

432.    The Banks were well aware that the extended time for Milestone to achieve Substantial Completion and deliver a Temporary Certificate of Occupancy was not extended beyond January 19, 2022.

433.    At least as of January 19, 2022, Milestone was in material breach of the GMP Contract.

434.    Upon information and belief, the Banks knew, or should have known, that at least as of January 19, 2022, Milestone was in material breach of the GMP Contract and could never perform as required.

435.    The Banks' Independent Consultants were similarly aware of the January

19, 2022 deadline, and that they had a duty to advise on the progress of the Project in their monthly reports.

436.    The Independent Consultant was charged with monitoring the progress of the Project and was duty bound to not only identify that the general contractor failed to meet the most material term of the GMP Contract, and that same could not be cured.

437.    As a result, the Banks were required to protect the Project, and all the other collateral, not further dissipate same, and had the contractual right, ability and obligation to replace the Engineering Defendants with a competent Independent Consultant as requested by owner Plaintiffs.

438.    In breach thereof, the Banks did not replace the Engineering Defendants with a competent Independent Consultant, and by virtue thereof, the Engineering Defendants remained on the Project, and Milestone remained on the Project for more than two (2) years beyond their un-curable material default of failing to timely Substantially Complete the Project (not to mention the numerous other defaults which were not identified either by the Banks, the Banks' Administrative Agent and the Banks' incompetent Independent Consultant).

439.    As a direct and proximate result of the Banks' above described breaches of the Building Loan Agreements, Owner Plaintiffs have been damaged as above described, requiring removal, demolition and environmental clean-up, and thereafter a complete re-building of what has been built under the Contract over the past four (4) years.

440.    As a result of breaches by the Banks of the Building Loan Agreements as above set forth, Owner Plaintiffs were damaged in that, inter alia, Owner Plaintiffs were (i) materially delayed in the performance of the Work and in the timely completion of the Work, and suffered the damages accruing as a result thereof; and (ii) damaged in an amount required to

demolish all the non-conforming work, and rebuild the Project in conformance with the Construction Drawings, to be determined at the time of trial, believed to be in excess of Eighty Three Million Dollars ($83,000,000.00).

441.     Due to breaches by Banks of the Building Loan Agreements as above set forth, the Owner Plaintiffs were unable to recognize their lost profit, which was the purpose of the developing the Project and entering into the Building Loan and related agreements, which was anticipated to be earned on the sale of the Condominium Units, resulting in an additional loss to Owner Plaintiffs an amount to be determined at trial, believed to be in excess of Twenty-Three Million Dollars ($23,000,000.00).

442.     By reason of the above, judgment should be rendered against the Banks for their numerous breaches of the Building Loan Agreements in an amount to be determined at trial, believed to be not less than One Hundred Six Million Dollars ($106,000,000.00).

## SECOND CLAIM FOR RELIEF

### *Fraud*
### *Against Banks, and Defendants Wu, Chan, Lau and Tian*

443.     Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

444.     defendants Wu, Chan, Lau and Tian, and through them, defendants SCB and SCSB made numerous fraudulent misrepresentations to Plaintiffs as above detailed, including, without limitation:

(i)     In connection with the Owner Plaintiff's intention to retain David Lo, and his companies, Mandarin Enterprises II, Inc., in late 2019 as the successor general contractor, defendant Wu refused to have the Banks consent to same, claiming that the Banks were "not familiar" with Mr. Lo or his company, and could not consent to Owner Plaintiffs retaining him, as the Banks had no certainty that he had the ability to complete the Project; when that statement was false and fraudulent, as the Banks, through Mr. Wu in fact, refused to

102

consent to Owner Plaintiffs hiring David Lo and Mandarin Enterprises II, Inc., because defendant Wu wanted Owner Plaintiffs to retain Frank Ng as the successor general contractor for the Project as more fully described above;

(ii)    In connection with the Banks' introduction of Frank Ng to Owner Plaintiffs, the Banks and defendant Wu fraudulently misrepresented that Frank Ng was a highly qualified and experienced general contractor, with an extensive track record, having successfully built sizeable Projects in New York, when upon information and belief they knew, or should have known that to be false, as more fully described above;

(iii)   The Banks, through their Administrative Agent defendant Wu were responsible to review and approve the Milestone GMP Contract, and upon information and belief knew, or should have known that it was a true GMP Contract, and that there was no provision for any "allowances"; that a "Change Order" required the Architect to prepare and approve same, and submit it to the Banks for prior written approval, failing which the Building Loan Agreements prohibited the payment of any Change Orders; that there were no Change Orders prepared by the Architect and agreed to by the Owner Plaintiffs, and knew or should have known that no Change Orders were appropriately included in any of the 14 Requests for Advance, yet the Banks, and defendant Wu intentionally and fraudulently misrepresented to Owner Plaintiffs that the non-complying, Fraudulent Change Orders prepared and submitted by Milestone were appropriate and must be paid, as more fully described above;

(iv)    In connection with the Fraudulent Change Orders, the Banks and defendant Wu upon information and belief knew, or should have known, that notwithstanding that they were not in fact appropriate Change Orders, and were prohibited from being paid at all under the Building Loan Agreements, they nonetheless ***Qualified as Building Loan Costs***, and to the extent they were being required to be paid, they should  rightfully be paid out of the un-used portions of the Building Loans which remained available to fund same, but fraudulently misrepresented that they can only be paid out of Plaintiffs' other funds, as more fully set forth above;

(v)     That in connection with the Banks' introduction of SCG America Group, the Banks and defendants Wu, Chan, Lau and Tian, fraudulently misrepresented to Plaintiffs that the SCG Defendants were interested in providing a mezzanine loan to Plaintiffs, when upon information and belief they knew, because they orchestrated it, that the SCG Defendants true intention was to take over he Project and foreclose on the Owner Plaintiffs' collateral, as more fully described above;

(vi)     That in connection with the Bank's wrongful orchestrating the Management Substitution Plan as above set forth, Plaintiffs assert on information and belief, that the Banks authorized SCG America Construction to issue its Fraudulent CM Invoice for $153,000.00, and further demanded payment for same, when the Banks and defendants Wu, Chan, Lau and Tian, upon information and belief knew or should have known, that SCG America Construction was never retained by Plaintiffs for anything, never performed any Construction Management services for the Project, and had no right to invoice or collect any sums from Plaintiffs;

(vii)    In connection with the April 27, 2022 Forbearance Agreement, the Banks, through defendant Chan, made material misrepresentations to Plaintiffs about the nature of the Forbearance Agreement in Order to wrongfully induce Plaintiffs to sign same, including, without limitation, that the Forbearance Agreement was simply perfunctory, in that it was a mere "procedural formality" that they had to sign in Order for the Banks to continue funding the Loans; when the Banks and defendant Chan upon information and belief knew, or should have known that a Forbearance Agreement generally, and the Forbearance Agreement they insisted be signed by Plaintiffs was anything but perfunctory, and simply a "procedural formality" that they had to sign in Order for the Banks to continue funding the Loans; and

(viii)   In connection with the April 27, 2022 Forbearance Agreement, the Banks, through defendant Chan, made material misrepresentations to Owner Plaintiffs when they asked about the requirement that Plaintiffs deliver a deed in lieu of foreclosure, fraudulently stating that they are a bank, and they have no intention of "taking" Owner Plaintiffs properties, when upon information and belief they knew, or should have known, that it was precisely because the Banks wanted to have a way to "take" the properties without due process or legal action, that they demanded a deed in lieu of foreclosure as more fully described above.

445.    The Banks and defendants Wu, Chan, Lau and Tian, respectively, made each of the above misrepresentations, when upon information and belief they knew, or should have known, that each such misrepresentation was false and fraudulent, and made with the intent to deceive Owner Plaintiffs, and that Owner Plaintiffs relied on same to their detriment.

446.    As a result of defendants' fraud as above described, Plaintiffs were deceived to their detriment as above described.

447.    As a result of the fraud of the Banks and defendants Wu, Lau, Chan and

Tian, as above set forth, Owner Plaintiffs have been damaged in an amount to be proved at trial, which is believed to be in excess of $106,000,000.00.

448.    Plaintiffs therefore seek an award of damages from the Banks, Wu, Lau, Chan and Tian, jointly and severally, in an amount to be proved at trial, which is believed to be in excess of $106,000,000.00.

449.    Because the frauds of the Banks and defendants Wu, Chan, Lau, and Tian were so pervasive and outrageous, and in order to deter the defendants from continuing to defraud their customers, Owner Plaintiffs seek an award of Punitive Damages, jointly and severally, in an amount of Two Hundred Fifty Million Dollars ($250,000,000.00) against the Banks and defendants Wu, Chan, Lau, and Tian.

### THIRD CLAIM FOR RELIEF

#### *Economic Duress*
#### *Against Defendants SCB, SCSB, Wu, Lau, Chan and Tian*

450.    Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

451.    The Banks and defendants Wu, Lau, Chan and Tian were each aware that Plaintiffs had invested the vast majority of the Chen Family's wealth into the Project, had exhausted all of their liquid resources, and that by requiring the payment of the Fraudulent Change Orders, and not permitting Owner Plaintiffs to draw any of said amounts from the Building Loans, not only constituted breaches of the Building Loan Agreements, and fraud, but also placed Plaintiffs under unfathomable pressure, as the Banks controlled their financial future, whether they would have a home to live in, and a business from which to earn a living.

452.    Upon information and belief the Banks and defendants Wu, Lau, Chan and Tian each knew, or should have known, that their continuing systemic failures to fund the

Requests for Advances and by requiring the payment of Fraudulent Change Orders, and by refusing to pay Fraudulent Change Orders out of the Building Loans, when they clearly qualified as Building Loan Costs, would increase the pressure on, and put the Plaintiffs in financial jeopardy.

453.    By authorizing defendant SCG America Construction to issue the Fraudulent CM Invoice, and dunning Plaintiffs to pay same, when the Banks and defendants Wu, Lau, Chan and Tian upon information and belief each knew, or should have known, that SCG America Construction was never retained by Owner Plaintiffs to provide any services to the Project, and then demanding that Plaintiffs pay same, further contributed to the increasing pressure and abuse the Banks and the defendants Wu, Lau, Chan and Tian were placing upon Plaintiffs, at a time when they could not come up with additional cash, which contributed to the ever increasing pressure and anxiety thrust upon Plaintiffs.

454.    By threatening to terminate and stop funding the Building Loans, and to initiate foreclosure on the Property and Lafayette Street Property, and in light of the lies and coercion of the Banks and defendants Wu, Chan, Lau and Tian, Plaintiffs were in fear of ending up destitute and homeless if they didn't sign the Forbearance Agreement, leaving Plaintiffs with no other practical option but to agree to the Banks' demands at a time when they lacked the free will not to.

455.    The acts of the Banks and defendants Wu, Chan, Lau and Tian as stated above constitute economic duress.

456.    As a proximate cause of the Banks and defendants Wu, Chan, Lau and Tian economic duress, Plaintiffs have suffered damages in an amount to be proved at trial, which is believed to be in excess of $106,000,000.00.

457. Plaintiffs therefore seek an award of damages against the Banks, Wu, Lau, Chan and Tian, jointly and severally, in an amount to be proved at trial, which is believed to be in excess of $106,000,000.00.

458. Because the frauds and economic duress by the Banks and defendants Wu, Chan, Lau, and Tian were so outrageous, and in Order to deter the defendants from continuing to coerce or threaten their customers, Plaintiffs seek an award of Punitive Damages, jointly and severally, in an amount of Two Hundred Fifty Million Dollars ($250,000,000.00) against the Banks and defendants Wu, Chan, Lau, and Tian.

## FORTH CLAIM FOR RELIEF

### *Breach of Fiduciary Duty*
### *Against Defendants SCB, SCSB,  and Against Defendants*
### *Wu, Lau, Chan and Tian as Aiders and Abettors*

459. Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

460. Although generally, a lender does not owe a borrower any fiduciary duties, where, as here, a lender goes beyond an ordinary debtor-creditor relationship, and takes actual, participatory control of the borrower, the law of instrumentality views such a creditor as the debtor's alter ego, or the debtor becomes the creditor's instrument, and as such, the lender can be held liable for the debtor's debt.

461. Pursuant to *Restatement (Second) Of Agency* § 140 (1958): a "***creditor who assumes control of his debtor's business for the mutual benefit of himself and his debtor, may become a principal, with liability for the acts and transactions of the debtor in connection with the business***".

462. An accompanying comment to the Restatement further provides: "A

security holder who merely exercises a veto power over the business acts of his debtor by preventing purchases or sales above specified amounts does not thereby become a principal. ***However, if he takes over the management of the debtor's business either in person or through an agent, and directs what contracts may or may not be made, he becomes a principal, liable as any principal for the obligations incurred thereafter in the normal course of business by the debtor who has now become his general agent***."

463.    Here, the Banks, through defendants Wu, Lau, Chan and Tian, each of whom is an aider and abettor, have assumed such actual, participatory control of the Owner Plaintiffs borrowers and have directed which contracts may or may not be made as detailed above, have becomes "principals," liable as any principal for the obligations incurred by the Plaintiff borrowers.

464.    By virtue of the actual, participatory control assumed by the Banks through their aiders and abettors, defendants Wu, Chan, Lau and Tian, of the Owner Plaintiff borrowers and by directing which contracts may or may not be made, as detailed above, has resulted in defendants SCB and SCSB becoming fiduciaries of Owner Plaintiffs, and owing Owner Plaintiffs the highest duties of care, honesty and loyalty, as well as the duty to act in the best interests of Owner Plaintiffs.

465.    Rather than protect the Plaintiffs, the Banks and their aiders and abettors, defendants Wu, Chan, Lau and Tian, worked to harm the Owner Plaintiffs, lied and deceived the Owner Plaintiffs, and sought multiple opportunities to place financial and other obstacles in the Owner Plaintiffs' way, and self-deal for their own gain all at the Owner Plaintiffs' expense, as detailed above.

466.    As a result of the misconduct and the wrongful acts of the Banks and

defendants Wu, Chan, Lau and Tian, all of whom acted in their own self-interest, numerous conflicts of interest were created and they took actions which were counter to the best interests of Owner Plaintiffs as detailed above, defendant SCB and SCSB have breached the fiduciary duties owed by them to Owner Plaintiffs, and were aided and abetted in so doing by defendants Wu, Chan, Lau and Tian.

467.    As a result of the breaches of fiduciary duties by SCB and SCSB, and their aider and abettors, defendants Wu, Chan, Lau and Tian, Plaintiffs have been damaged in an amount equal to the debts incurred in favor of SCB and SCSB, and therefore SCB and SCSB are liable for the debts of Owner Plaintiffs, and Owner Plaintiffs seek this Court's order directing defendants SCB and SCSB to be responsible to pay all such debts by direct offset against same, or by requiring defendants Wu, Chan, Lau and Tian to be personally, jointly and severally responsible for the payment of Plaintiffs' debts to SCB and SCSB, reducing the amount owed by Owner Plaintiffs to SCB and SCSB.

468.    Because the breaches of fiduciary duties by the Banks through the actions or inactions of their aiders and abettors, defendants Wu, Chan, Lau and Tian, were so egregious, Owner Plaintiffs are entitled to an award of punitive damages, in an amount sufficient to deter defendants from acting in such ways and breaching their fiduciary duties in the future.

469.    Plaintiffs therefore seek an award of Punitive Damages, jointly and severally, against the Banks and defendants Wu, Chan, Lau, and Tian in an amount of Two Hundred Fifty Million Dollars ($250,000,000.00).

## FIFTH  CLAIM FOR RELIEF

### *Breach of Covenant of Good Faith and Fair Dealing*
### *Against the Banks and Defendants Wu, Chan, Lau and Tian*

470.    Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

471.    Owner Plaintiffs are informed and believe, and thereon allege, that by engaging in the acts and breaches described herein, the Banks and defendants Wu, Chan, Lau and Tian have breached the implied covenant of good faith and fair dealing present in every contractual relationship.

472.    As a proximate result of the Banks and defendants Wu, Chan, Lau and Tian breaches of the implied covenant of good faith and fair dealing, Owner Plaintiffs have been damaged and will continue to be damaged in an amount to be proven at trial., believed to be not less than One Hundred Six Million Dollars ($106,000,000.00).

## SIXTH  CLAIM FOR RELIEF

### *Negligence and Professional Malpractice*
### *Against Defendants Partners Engineering, Partners Assessments, Rafanelli, McClennon and Requarth*

473.    Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

474.    As the Independent Consultants under the Building Loan Agreement, defendants Partners Engineering, Partners Assessments, Rafanelli, McClennon and Requarth were engaged by the Banks' Administrative Agent, at the Owner Plaintiffs' cost  and  expense, to perform a competent project documentation review (including but not limited to the Plans and Specifications, and GMP Contract and the Building Loan Agreement),  to competently monitor the

Project, and competently review and approve of Requests for Advances under the Building Loan

Agreements, and conduct regular site visits, not less than once every month, in connection with the

administration of the Loan and the Project.

475.    The Owner Plaintiffs and the Purported Guarantor plaintiffs are each parties

to the Loans and related Loan Documents, and are each third party beneficiaries of the retention

agreement between the Banks and defendants Partners Engineering, Partners Assessments,

Rafanelli,, McClennon and Requarth, who were retained to collectively act as the Banks'

Independent Consultants.

476.    Defendants Partners Engineering, Partners Assessments, Rafanelli,

McClennon and Requarth, as the Banks' Independent Consultants each had an obligation to

comply with the terms of their retention pursuant to the Building Loan Agreements, to undertake a

competent project documentation review (including but not limited to the Plans and Specifications,

and GMP Contract and the Building Loan Agreement),  to competently monitor the Project, and

competently review and approve Requests for Advances pursuant to the Building Loan

Agreements and the Milestone GMP Contract, and to conduct regular site visits, not less than once

every month, in connection with the administration of the Loan and the Project, and owed the

Banks and the Owner Plaintiffs a duty of care to perform their Consulting Duties in a timely

fashion, to exercise reasonable care when performing their responsibilities in monitoring the

General Contractor's construction activities, to make sure that the General Contractor is

conforming its Work to the Contract Documents and the Plans and Specifications in a good and

workmanlike manner, within industry standards, and paying its subcontractors, to not misrepresent

the scope of its Work that was included in the GMP, and to prepare a monthly report in

compliance therewith.

111

477.    Defendants Partners Engineering, Partners Assessments, Rafanelli,, McClennon and Requarth each breached their respective duties of care as set forth above by, among other things, failing to perform the Engineers Consulting Duties in compliance with the terms of the Building Loan Agreements, failing to undertake a competent project documentation review, failing to competently monitor the Project, and failing to competently review and approve requisitions for Advances under the Building Loan Agreement and the Building Loan Agreement as reasonable consultants are expected to do in accordance with industry standards and their respective professional responsibilities.

478.    In addition, and upon information and belief, defendants Partners Engineering, Partners Assessments, Rafanelli, McClennon and Requarth, each failed to act or acted in a negligent, reckless and/or fraudulent manner, in failing to identify and disclose that Milestone was not constructing the Project in accordance with the Contract Drawings, Construction Specifications, Construction Details and Construction Notes published on the Contract Drawings, and failing to conform its Work to industry standards, intentionally failing to pay subcontractors for their services, and misrepresenting the scope of Work that was included in the GMP.

479.    Additionally, because of their negligence, recklessness and/or breaches of their respective duties to the Banks and the Owner Plaintiffs as the persons paying them and as third party beneficiaries, defendants Partners Engineering, Partners Assessments, Rafanelli, McClennon and Requarth, each committed professional malpractice, either as engineers, architects and/or project managers, by failing to identify that Milestone, as the General Contractor, was not conforming the Work to the requirements of the Contract Documents, and by not properly monitoring and identifying the negligent construction and construction defects caused by

Milestone, and failing to include any reference to same in their monthly reports, when, had the

Engineering Defendants acted reasonably, and in accordance with industry standards and their

respective professional responsibilities, they should have reported that Milestone:

(i)     failed to waterproof, enclose or install protective sealants at all existing slabs, walls and columns including underside of slab and beams in connection with its construction of the new terrace in express violation of the GMP Contract;

(ii)    failed to conform to the requirements of the Contract Documents in that Milestone, failed to waterproof W8 x 31 column on existing beam in express violation of the GMP Contract.

(iii)   Failed to perform the Structural work in accordance with Structural Construction Drawing S -201;

(iv)    failing to follow Waterproofing Detail 4-S02; failing to conform the Work to construction details, Construction specifications and construction notes which Milestone was contractually required to follow in performing the Scope of Work which Milestone contracted to perform, including, without limitation, Structural Construction Drawing S -301.01, which provided a Typical Railing Detail requiring the removal of the slab in area of post fill pocket with concrete or grout and waterproof per Architect's Drawings;

(v)     failing to remove the slab in area of post and fill pocket with concrete or grout and waterproof per Architect's Drawings;

(vi)    failing to following the Flashing Detail 10 S201, on the Structural Construction Drawing S - S 201.01, which provided for flashing and finishes in accordance with the Architectural drawings;

(vii)   failing follow the Flashing Detail 11 S201, on the Structural Construction Drawing S - S 201.01, which provided for flashing and finishes in accordance with the Architectural drawings;

(viii)  failing to conform the Work to the requirements of the Contract Documents in that Milestone failed to provide flashing in express violation of the GMP Contract;

(ix)    failing to follow Architectural Construction Drawing A 101.03 – by failing to comply with specific Construction Note 3, requiring Milestone to provide a waterproofing membrane under bathrooms, turned up vertically 6" at wall intersections, and Note 6, requiring Milestone to install a roofing membrane with 10 years warranty, pursuant to the

Specifications, and provide metal flashing, turned up vertically at all intersection with the roof as set forth in the Construction Notes published on the Plans;

(x)     failing to follow Structural Construction Drawing EN 102.01, which provided for bulkhead type "k" detail: bituminous membrane over flashing cement or asphalt on roof membrane on 6" min. r34.8 rigid insulation;

(xi)    failing to provide a bituminous membrane over flashing cement or asphalt on roof membranes on 6" min. r34.8 rigid insulation for wall type F in express violation of the GMP Contract;

(xii)   failing to follow Structural Construction Drawing EN 102.01, which provided for bulkhead type "l" detail: bituminous membrane over flashing cement or asphalt on roof membrane on 6" min. r34.8 rigid insulation;

(xiii)  failing to conform the Work to the requirements of the Contract Documents in that Milestone failed to provide a bituminous membrane over flashing cement or asphalt on roof membranes on 6" min. r34.8 rigid insulation for wall type N in express violation of the GMP Contract;

(xiv)   failing to perform, including, without limitation, Construction Drawing A 502.01, which provided for a waterproofing membrane over tapered polyiso insul. sloped to drain;

(xv)    failing to follow Architectural Construction Drawing A 502.01, which provided a Detail B: for Wall Type "T", which required a waterproofing membrane over tapered polyiso insul. sloped to drain in Wall Type "T";

(xvi)   failing to follow Construction Drawing EN 102.01, which provided in a Section Detail at New Roof for surface conditioner over monolithic membrane over separation sheet over min. 6" min. r34.8 tappered rigid insulation; and

(xvii)  failing to follow Architectural Construction Drawing A 502.01, which provided a DETAIL B: for Wall Type "N", which required a waterproofing membrane over tapered polyiso insul. sloped to drain in Wall Type "N.

### *The Independent Consultants Fail To Identify Defective Construction*

480.    Notwithstanding the extensive defective Work resulting from Milestone's

negligent construction as above detailed, nowhere in the Independent Consultant Reports that

114

Owner Plaintiffs have obtained, did the Engineering Defendants identify the defective work, or caution the Banks and the Owner Plaintiffs of the gestating problems which a competent Engineer, Architect or Project Manager should have known would lead to severe physical damage if not properly and timely corrected.

481.     Moreover, as a result of the negligence, recklessness and malpractice of the Engineering Defendants, defendants Partners Engineering, Partners Assessments, Rafanelli, McClennon and Requarth, each committed professional malpractice by failing to undertake a competent review of the project document, including the Milestone GMP Contract and the Building Loan Agreement to properly determine what costs are include in the Scope of Work under the GMP Contract, and that costs in excess thereof are the sole obligation and expense of the contractor – not Owner Plaintiffs, and as a result of said negligence, recklessness and professional malpractice, defendants Partners Engineering, Partners Assessments, and Rafanelli, McClennon and Requarth each committed professional malpractice by wrongfully approving as costs to be paid by Owner Plaintiffs, rather than as proper Building Loan Covered Costs to be funded out of the unused Building Loan proceeds, or that they were not the responsibility of the Plaintiff Owners, because they were properly included in the GMP under the GMP Contract, including each of the following:

(a) that the cost of permits for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of permits for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(b) That the cost of insurance for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of insurance for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(c) That the cost of scaffolding for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of scaffolding for the Project

115

was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(d) That the cost of the sidewalk shed for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of the sidewalk shed for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(e) That the cost of Roof protection for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of Roof protection for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(f) That the cost of structural roof slab for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of structural roof slab for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(g) That the cost of Mason and façade work for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of Mason and façade work for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(h) That the cost of windows and window lintels for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of windows and window lintels for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(i) That the cost of steel and steel work for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of steel and steel work for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(j) That the cost of beam reinforcement for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of beam reinforcement for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(k) That the cost of Shop Drawings for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of shop drawings for the

Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(l)   That the cost of storefront for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of storefront for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(m) That the cost of mold resist /waterproof Sheetrock for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of mold resist /waterproof Sheetrock for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(n)   That the cost of the demo permit for the existing elevator for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of the demo permit for the existing elevator for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(o)   That the cost of the elevator shaft and reinforcement for new elevator for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of the elevator shaft and reinforcement for new elevator for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(p)   That the cost of inspections and inspections of damage for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of s inspections and inspections of damage for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(q)   That the cost of overtime for the Project's labor is not covered by the Scope of Work under the GMP Contract, when in fact the cost of overtime for the Project's labor for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(r)   That the cost of roof drains for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of roof drains for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(s)   That the cost of the sprinkler system for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of sprinkler system for the Project was indeed covered by, and included within, the clear and

unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(t) That the cost of water heaters for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of water heaters for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(u) That the cost of air conditioning and piping for air conditioning for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of air conditioning and piping for air conditioning for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(v) That the cost of roof railings for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of roof railings for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(w) That the cost of bike racks for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of bike racks for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(x) That the cost of electrical work and electric outlets for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of electrical work and electric outlets for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(y) That the cost of the fire alarm for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of the fire alarm for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(z) That the cost of elevator inspection for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of elevator inspection for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(aa)  That the cost of brick for the façade for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of brick for the façade for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(bb)   That the cost of the hoists for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of the hoists for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(cc)   That the cost of repairing damaged slabs for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of repairing damaged slabs for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(dd)   That the cost of finishes and finishes work for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of finishes and finishes work for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(ee)   That the cost of the hot water shut off valve for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of hot water shut off valve for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(ff)  That the cost of the water fountain for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of water fountain for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(gg)   That the cost of plumbing work and plumbing material for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of plumbing work and plumbing material for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(hh)   That the cost of the crane permit for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of crane permit for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(ii)  That the cost of electrical materials for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of electrical material for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

119

(jj) That the cost of remediating DOB violations issued against the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of remediating DOB violations issued against the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(kk) That the cost of appliances for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of appliances for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(ll) That the cost of cabinetry for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of cabinetry for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(mm) That the cost of wood flooring for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of wood flooring for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(nn) That the cost of tile for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of tile for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(oo) That the cost of doors & hardware for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of doors & hardware for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(pp) That the cost of low voltage electric work for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of low voltage electric work for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP;

(qq) That the cost of lighting fixtures for the Project is not covered by the Scope of Work under the GMP Contract, when in fact the cost of lighting fixtures for the Project was indeed covered by, and included within, the clear and unambiguous Scope of Work as set forth in the GMP Contract and included within the GMP; and

(rr) That with respect to REMOVING a portion of the second floor's interior construction would generate extra costs, when in fact same should result in a cost reduction resulted in a claim for additional compensation, which in fact should have resulted in a credit in favor of Owner Plaintiffs.

482.   As a direct and proximate result of defendants Partners Engineering, Partners Assessments, Rafanelli, McClennon and Requarth's negligence, recklessness, and professional malpractice and their breaches of their duties to the Banks and the Plaintiffs as third-party beneficiaries, Plaintiffs have been damaged in an amount to be determined at the time of trial, believed to be not less than One Hundred Six Million Dollars ($106,000,000.00).

**<u>SEVENTH CLAIM FOR RELIEF</u>**

***<u>Negligence - Construction Defects</u>***
***<u>Against Defendants SCB and SCSB and Wu</u>***

483.   Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

484.   As the Administrative Agent for the Banks, and acting on their behalf, defendant Wu, was tasked with reviewing and approving the Milestone GMP Contract, and approving each Requests for Advance against the Building Loan Agreements and administrating same responsibly and reasonably.

485.   As such, defendants SCB, SCSB and Wu each had a duty of care to perform in a timely fashion, to exercise reasonable care when performing and monitoring the construction activities and approving Requests for Advances for the Project.

486.   defendants SCB, SCSB and Wu each breached this duty of care as set forth above by, among other things, failing to retain a competent Independent Consultant, failing to properly monitor the progress of Milestone's Work on the Project, and making sure that the Work was being performed in accordance with the Contract Drawings, Construction

121

Specifications, Construction Details and Construction Notes published on the Contract Drawings, and timely achieving Substantial Completion by the Extended Substantial Completion Date, and issuing payments against Requests for Advances timely, so that the General Contractor does not breach its obligations, by slowing down or stopping the progress of the Work because they are not getting paid, and ensuring that all costs for which Milestone, as General Contractor (including all costs in excess of the GMP), was responsible for were timely paid.

487.    As a direct and proximate result of defendants SCB, SCSB and Wu's numerous breaches of their duty of care, defendants Milestone was not stopped from, and was allowed to, and/or performed in such a manner as to result in, faulty and negligent construction of the Project, and resulting construction defects, all leading to severe water infiltration and the resultant damages as above described.

488.    As a direct and proximate result of defendants SCB, SCSB and Wu's negligence and breaches of their respective duties owed to the Owner Plaintiffs, Owner Plaintiffs have been damaged in an amount to be determined at the time of trial, believed to be not less than One Hundred Six Million Dollars ($106,000,000.00).

### EIGHTH CLAIM  FOR RELIEF

#### *Unfair Business Practices*

#### *Against defendants SCB, SCSB, Wu, Lau, Chan and Tian and defendant SCG America Construction*

489.    Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

490.    At all relevant times, defendants SCB, SCSB, Wu, Lau, Chan and Tian operated a banking business.

491.   At all relevant times, defendants SCB, SCSB, Wu, Lau, Chan and Tian were in the business of providing banking services to the general public, and specifically as set forth in this Complaint, to Owner Plaintiffs.

492.   Defendants SCB, SCSB, Wu, Lau, Chan and Tian engaged in unlawful and unfair business practices by, among other things:

(i)   In connection with the Owner Plaintiff's intention to retain David Lo, and his companies, Mandarin Enterprises II, Inc., in late 2019 as the successor general contractor, defendant Wu refused to have the Banks consent to same, claiming that the Banks were "not familiar" with Mr. Lo or his company, and could not consent to Owner Plaintiffs retaining him, as the Banks had no certainty that he had the ability to complete the Project; when upon information and belief that statement was false and fraudulent, as the Banks, through Mr. Wu in fact, refused to consent to Owner Plaintiffs hiring David Lo and Mandarin Enterprises II, Inc., because defendant Wu wanted Owner Plaintiffs to retain Frank Ng as the successor general contractor for the Project as more fully described above;

(ii)   In connection with the Banks' introduction of Frank Ng to Owner Plaintiffs, the Banks and defendant Wu fraudulently misrepresented that Frank Ng was a highly qualified and experienced general contractor, with an extensive track record, having successfully built sizeable Projects in New York, when upon information and belief they knew, or should have known that to be false, as more fully described above;

(iii)   The Banks, through their Administrative Agent, defendant Wu were responsible to review and approve the Milestone GMP Contract, and upon information and belief knew, or should have known that it was a true GMP Contract, and that there was no provision for any "allowances"; that a "Change Order" required the Architect to prepare and approve same, and submit it to the Banks for prior written approval, failing which the Building Loan Agreements prohibited the payment of any Change Orders; that there were no Change Orders prepared by the Architect and agreed to by the Owner Plaintiffs, and knew or should have known that no Change Orders were appropriately included in any of the 14 Requests for Advance, yet the Banks, and defendant Wu intentionally and fraudulently misrepresented to Owner Plaintiffs that the non-complying, Fraudulent Change Orders prepared and submitted by Milestone were appropriate and must be paid, as more fully described above;

(iv)   In connection with the Fraudulent Change Orders, the Banks and defendant Wu upon information and belief knew, or should have known, that

notwithstanding that they were not in fact appropriate Change Orders, and were prohibited from being paid at all under the Building Loan Agreements, they nonetheless ***Qualified as Building Loan Costs***, and to the extent they were being required to be paid, they should  rightfully be paid out of the un-used portions of the Building Loans which remained available to fund same, but fraudulently misrepresented that they can only be paid out of Plaintiffs' other funds, as more fully set forth above;

(v)     That in connection with the Banks' introduction of SCG America Group, Banks and defendants Wu, Chan, Lau and Tian, fraudulently misrepresented to Owner Plaintiffs that the SCG Defendants were interested in providing a mezzanine loan to Plaintiffs, when upon information and belief they knew, because they orchestrated, that the SCG Defendants' true intention was to take over the Project and foreclose on the Owner Plaintiffs' collateral, as more fully described above;

(vi)    That in connection with the Bank's wrongful orchestrating the Management Substitution Plan as above set forth, Owner Plaintiffs assert, on information and belief, that the Banks authorized SCG America Construction to issue its Fraudulent CM Invoice for $153,000.00, and further demanded payment for same, when the Banks and defendants Wu, Chan, Lau and Tian, knew or should have known, that SCG America Construction was never retained by Owner Plaintiffs for anything, never performed any construction management services for the Project, and had no right to invoice or collect any sums from Plaintiffs;

(vii)   In connection with the April 27, 2022 Forbearance Agreement, the Banks, through defendant Chan, made material misrepresentations to Plaintiffs about the nature of the Forbearance Agreement in Order to wrongfully induce Plaintiffs to sign same, including, without limitation, that the Forbearance Agreement was simply perfunctory, in that it was a mere "procedural formality" that they had to sign in Order for the Banks to continue funding the Loans; when the Banks and defendant Chan upon information and belief knew, or should have known that a Forbearance Agreement generally, and the Forbearance Agreement they insisted be signed by Plaintiffs was anything but perfunctory, and was not simply a "procedural formality" that they had to sign in order for the Banks to continue funding the Loans; and

(viii)  In connection with the April 27, 2022 Forbearance Agreement, the Banks, through defendant Chan, made material misrepresentations to Plaintiffs when they asked about the requirement that Owner Plaintiffs deliver a deed in lieu of foreclosure, fraudulently stating that they are a Bank, and they have no intention of "taking" Owner Plaintiffs properties, when upon information and belief they knew, or should have known, that it was precisely because the Banks wanted to have a way to "take" Owner Plaintiffs' Property without due

124

process or legal action, that they demanded a deed in lieu of foreclosure as more fully described above.

493.    At all relevant times, defendant SCG America Construction operated an international construction business.

494.    At all relevant times, defendant SCG America Construction was in the business of providing construction and construction management services to the general public, and as set forth in this Complaint, by claiming to have provided construction management services to the Owner Plaintiffs.

495.    Defendant SCG America Construction engaged in unlawful and unfair business practices by, among other things, claiming to have provided construction management services to Owner Plaintiffs, when it had not, and issuing, and demanding payment for the Fraudulent CM Invoice for $153,000.00 as above detailed.

496.    Defendants SCB, SCSB, Wu, Lau, Chan and Tian's violations of law and Unfair Business Practices resulted the loss of the value of the Property, loss of use and enjoyment of their Property, and defective Work which now needs to be repaired by demolishing most of the construction and re-building the improvements in accordance with the Construction Drawings and Plans and Specifications as more fully detailed above.

497.    As a result of defendants SCB's, SCSB's, Wu's, Lau's, Chan's and Tian's unfair business practices, defendants SCB, SCSB, Wu, Lau, Chan and Tian illegally profited at the expense of Plaintiffs and should be held liable for same in an amount to be proved at trial, believed to be in excess of One Hundred Six Million Dollars ($106,000,000.00) for which they should be jointly and severally liable.

498.    As a result of the unfair business practices of defendant SCG America Construction, Owner Plaintiffs have been damaged in an amount to be proved at trial.

## NINTH CLAIM FOR RELIEF

### *Unjust Enrichment*
### *Against Defendants SCB, SCSB, Partners Engineering and Partner Assessments*

499.    Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

500.    As a result of the actions, inactions, misrepresentations, fraud, economic duress, undue influence, negligence, recklessness, failure to provide consideration and/or mistakes by defendants SCB, SCSB, Partners Engineering and Partner Assessments were unjustly enriched.

501.    The unjust enrichment of defendants SCB, SCSB, Partners Engineering and Partner Assessments included all payments of fees, costs, expenses, interest, and charges for the time which defendants SCB, SCSB, Partners Engineering and Partner Assessments received from Plaintiffs pursuant to the Project Loans and Building Loans, and the retention of the Independent Consultants pursuant thereto, and which resulted in the Project to be delayed, and remain unbuilt,

502.    Plaintiffs reserve the right to assert additional claims for unjust enrichment against defendants Wu, Chan, Lau and Tian, should Plaintiffs be able to prove through discovery that said parties were self-dealing or wrongfully received as bribes, kick-backs or other improper consideration, in connection with the Project. if any, and which will be inserted by way of amendment or established at the time of trial.

503.    Based on the actions, inactions, negligence, misrepresentations, fraud, recklessness, economic duress, unfair business practices, undue influence, failure to provide consideration and/or mistakes by the defendants SCB, SCSB, Partners Engineering and Partner Assessments in their dealings with Plaintiffs as above detailed, it would be manifest injustice,

and against equity and good conscience to permit said parties to retain what is sought to be recovered.

504.     As a result of defendants SCB, SCSB, Wu, Lau, Chan and Tian's unjust enrichment at Plaintiffs' expense, Plaintiffs have been damaged in an amount to be proven at trial.

## **TENTH CLAIM FOR RELIEF**

### ***Common Law Indemnification***
### ***Against Defendants SCB, SCSB, Partners Engineering, Partners Assessment,***
### ***Wu, Chan, Lau, Tian, Raffaelli, McClennon and Requarth***

505.     Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

506.     Defendants SCB, SCSB, Wu, Chan, Lau, Tian, Partners Engineering, Partners Assessment, Raffaelli, McClennon and Requarth all undertook to monitor the performance of Milestone's construction at the Project, and appropriately estimate the percentage of completion, and not authorize the payment of any amounts in excess of the GMP based thereon, and to monitor that the Work being performed on the Project site was undertaken pursuant to, and in accordance with the Construction Drawings, and that any defective work be identified and repaired by Milestone at their cost pursuant to the GMP Contract.

507.     By failing to properly review and monitor the Project, and in failing to properly administer the Requests for Payment as above set forth, and failure to identify the negligent construction work of Milestone and the resultant defective construction, defendants SCB, SCSB, Partners Engineering, Partners Assessment, Wu, Chan, Lau, Tian, Raffaelli, McClennon and Requarth are liable to Owner Plaintiffs under Common Law Indemnification.

508.     By virtue of Common Law Indemnification, defendants SCB, SCSB,

Partners Engineering, Partners Assessment, Wu, Chan, Lau, Tian, Raffaelli, McClennon and Requarth have indemnified Owner Plaintiffs for the damages and losses resulting from their respective failures to exercise reasonable care as above set forth, and in failing to properly monitor and administer the Project and the Loans, and as a result, are jointly and severally liable to Owner Plaintiffs, in an amount to be proved at trial, and believed to be in excess of One Hundred Six Million Dollars ($106,000,000.00).

### ELEVENTH CLAIM FOR RELIEF

***Tortious Interference With Contract Rights***
***Against Defendants SCB, SCSB, Partners Engineering,***
***Partners Assessments, Rafanelli, McClennon, Requarth, Wu, Chan, Lau and Tian***

509.    Owner Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

### *Intentional Interference with the Milestone GMP Contract*

510.    Since March 20, 2020, a valid GMP Contract existed between the Owner Plaintiff and Milestone for the construction of the Project.

511.    Defendants SCB, SCSB, Partners Engineering, Partners Assessments, Rafanelli, McClennon, Requarth, Wu, Chan, Lau and Tian each had knowledge of the GMP Contract.

512.    Defendants SCB, SCSB, Partners Engineering, Partners Assessments, Rafanelli, McClennon, Requarth, Wu, Chan, Lau and Tian's actions and inactions with respect to authorizing Fraudulent Change Orders, failing to fund Requests for Advances and failing to properly monitor the progress of Milestone's negligent construction, and the resulting defective Work, and failure to require correction or removal of same, and as otherwise described in detail above, intentionally and unjustifiably induced Milestone to breach its GMP Contract with the

Owner Plaintiffs as above detailed, constituting the tort of intentional interference of Owner Plaintiffs' contract rights.

513.    As a result of the intentional interference by defendants SCB, SCSB, Partners Engineering, Partners Assessments, Rafanelli, McClennon, Requarth, Wu, Chan, Lau and Tian's intentional interference of Owner Plaintiffs' contractual rights under the Milestone GMP Contract, Owner Plaintiffs have been damaged in an amount to be proved at trial, believed to be in excess of One Hundred Six Million Dollars ($106,000,000.00), for which defendants SCB, SCSB, Partners Engineering, Partners Assessments, Rafanelli, McClennon, Requarth, Wu, Chan, Lau and Tian should be held jointly and severally liable.

### _Intentional Interference with the Building_ _Loan Agreement –Refusal to approve Lo_

514.    Since prior to March 2020, valid Building Loan Agreements existed between the Owner Plaintiff and defendants SCB and SCSB with respect to Building Loans for the construction of the Project.

515.    Defendant Wu had knowledge of the Building Loan Agreements.

516.    Defendant Wu's actions and inactions with respect to failing to give the Banks' consent to Plaintiffs retaining David Lo and Mandarin Enterprises II, and instead forcing Owner Plaintiffs to retain Frank Ng and Milestone as the general contractor for the Project as above detailed, constitutes the tort of Intentional Interference with Owner Plaintiffs' contract rights.

517.    As a result of the intentional interference by defendant Wu of Owner Plaintiff's Building Loan Agreements with defendants SCB and SCSB, Owner Plaintiffs have been damaged in an amount to be proved at trial, believed to be in excess of One Hundred Six Million Dollars ($106,000,000.00), for which defendant Wu should be held liable.

### *Intentional Interference with the Building Loan Agreement –*
### *Failure to Reject Fraudulent Change Orders and Wrongful*
### *Rejection of Qualified Building Loan Costs*

518.    Since before March 2020, a valid Building Loan Agreements existed between the Owner Plaintiff and defendants SCB and SCSB with respect to construction of the Project.

519.    Defendants Wu, Partners Engineering, Partners Assessment, Rafanelli, McClennon and Requarth upon information and belief had, or should have had, knowledge of the Building Loan Agreements and the GMP Contract.

520.    defendants Wu, Partners Engineering, Partners Assessment, Rafanelli, McClennon and Requarth's actions and inactions as above set forth, with respect to failing to require compliance with the terms of the Building Loan Agreements and the GMP Contract as above detailed, as well as failing to reject the Fraudulent Change Orders, and when approved (albeit wrongfully), because those Fraudulent Change Orders qualified as Building Loan Costs to be funded out of the available Building Loan proceeds, and by refusing to authorize funded out of the available Building Loan proceeds, and otherwise as detailed above, constitute the tort of Intentional Interference with Owner Plaintiffs' contract rights.

521.    As a result of the Intentional Interference by defendants Wu, Partners Engineering, Partners Assessment, Rafanelli, McClennon and Requarth of Owner Plaintiff's Building Loan Agreements with defendants SCB and SCSB and Owner Plaintiffs' GMP Contract with Milestone, Owner Plaintiffs have been damaged in an amount to be proved at trial, believed to be in excess of One Hundred Six Million Dollars ($106,000,000.00), for which defendants Wu, Partners Engineering, Partners Assessment, Rafanelli, McClennon and Requarth should be held jointly and severally liable

## TWELFTH CLAIM FOR RELIEF

### *For Declaratory Judgment*

522.   Plaintiffs hereby incorporate by reference the factual allegations of the preceding paragraphs of this Complaint as though fully set forth herein.

523.   As above detailed, defendants SCB, SCSB, Wu, Chan, Lau and Tian have been trampling on Plaintiffs' rights including, without limitation, with respect to their use of coercion and economic duress of Plaintiffs to force them to sign the Forbearance Agreement detailed above, and as such the Forbearance Agreement is voidable.

524.   Additionally, because the Banks have never "signed" the Forbearance Agreement, it remained open for acceptance until withdrawn, and because it was withdrawn with the filing of this Adversary Proceeding, before defendants SCB and SCSB signed same, Plaintiffs submit that it is a nullity.

525.   Plaintiffs believe that defendants SCB and SCSB will take further imminent actions to seek to enforce said Forbearance Agreement (which is a nullity and voidable), which will be harmful and injurious to Plaintiffs, and as a result, there exists substantial, immediate, actual controversies between the Plaintiffs and defendants SCB and SCSB who have adverse legal interests, requiring this Court's declaratory judgment.

526.   Because the Forbearance agreement is a nullity and voidable as above stated, and because Plaintiffs' signatures thereon were obtained through defendants' fraud, coercion and economic duress as above detailed, the Forbearance Agreement is voidable by the Plaintiffs.

527.   Accordingly, Plaintiffs are entitled to the entry of a judgment declaring that the Forbearance Agreement, and all documents delivered in connection therewith, including,

without limitation, the Deed in Lieu to the Property, and all other transfer and assignment documents signed by Plaintiffs as void *ab initio*, as each was obtained without consideration, but rather as the result of defendants SCB, SCSB, Wu, Chan, Lau and Tian's fraud and economic duress.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 made applicable here by Federal Rule of Bankruptcy Procedure 9015, Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for a Judgment in favor of the Plaintiffs for the following relief:

(a)     On the first claim for relief for breach of contract-Building Loan Agreements against the Banks SCB and SCSB, seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00);

(b)     On the second claim for relief for fraud against Banks, and Wu, Chan, Lau and Tian, seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00); and because the frauds of SCB, SCSB, Wu, Chan, Lau and Tian were so egregious, seeking punitive damages of not less than Two Hundred Fifty Million Dollars ($250,000,000.00);

(c)     On the third claim for relief for economic duress against SCB, SCSB, Wu, Lau, Chan and Tian, seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00), and because the economic duress by SCB, SCSB, Wu, Chan, Lau and Tian were so egregious, seeking punitive damages of not less than Two Hundred Fifty Million Dollars ($250,000,000.00);

(d)     On the fourth claim for relief for breach of fiduciary duty against SCB, SCSB, and against Wu, Lau, Chan and Tian as Aiders and Abettors seeking a declaration that SCB, SCSB, Wu, Lau, Chan and Tian have become liable for the debts of the Debtors, and because the breaches of fiduciary duties by SCB, SCSB, Wu, Chan, Lau and Tian were so egregious, seeking punitive damages of not less than Two Hundred Fifty Million Dollars ($250,000,000.00);

(e)     On the fifth claim for relief for breach of covenant of good faith and fair dealing against the Banks and Wu, Chan, Lau and Tian, seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00);

(f)     On the sixth claim for relief for negligence and professional malpractice against Partners Engineering, Partners Assessments, Rafanelli, McClennon and Requarth seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00);

(g)     On the seventh claim for relief for negligence - construction defects against SCB and SCSB and Wu seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00);

(h)     On the eighth claim for relief for unfair business practices against SCB, SCSB, Wu, Lau, Chan and Tian and SCG America Construction, seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00);

(i)     On the ninth claim for relief for unjust enrichment against SCB, SCSB, Partners Engineering and Partner Assessments seeking compensatory damages in an amount to be proved at trial;

(j)     On the tenth claim for relief for common law indemnification against SCB, SCSB, Partners Engineering, Partners Assessment, Wu, Chan, Lau, Tian, Raffaelli, McClennon and Requarth, seeking compensatory damages of not less than One Hundred Six Million Dollars ($106,000,000.00);

(k)     On the eleventh claim for relief for tortious interference with contract rights against SCB, SCSB, Partners Engineering, Partners Assessments, Rafanelli, McClennon, and Requarth, Wu, Chan, Lau and Tian seeking compensatory damages of not less than one Hundred Six Million Dollars ($106,000,000.00); and

(l)     On the twelfth claim for relief for Declaratory Judgment, declaring that the Forbearance Agreement, and all documents delivered in connection therewith, including, without limitation, the deed in lieu to the Property, and all other transfer and assignment documents signed by Debtors as void ab initio, as each was obtained without consideration, and as the result of SCB, SCSB, Wu, Chan, Lau and Tian's fraud and economic duress.

**Dated:** New York, New York
April 9, 2024

**JACOBS PC**

**By: /s/ Leo Jacobs_____**
**Leo Jacobs**
**Attorneys for the Plaintiffs**
595 Madison Avenue, 39th Floor
New York, New York 10022
Tel. No.: (212) 229-0476